BURLINGTON INDUSTRIES, INC. v. MARTIN B. FOIL, JR., WIL-
LIAM H. TAYLOR, AND TUSCARORA COTTON MILL

No. 43

(Filed 25 February 1974)

1. Frauds, Statute of § 5— oral guaranty of payment — main purpose rule
   — insufficient interest in transaction

   Plaintiff's evidence was insufficient to support a jury finding that
   defendant had a sufficient direct, immediate and pecuniary interest
   in a corporation's transactions with plaintiff so that defendant's oral
   guaranty of payment for yarn furnished by plaintiff to the corpora-
   tion did not come within the statute of frauds, G.S. 22-1, where it
   showed that defendant was an officer, director and minority stock-
   holder in the corporation, that defendant's investment in the corpora-
   tion was only $750 and that credit extended by plaintiff to the
   corporation ultimately reached $125,000.

2. Frauds, Statute of § 5— oral guaranty — main purpose rule — insuffi-
   cient interest in transaction

   Plaintiff's evidence was insufficient to support a jury finding
   that defendant's oral guaranty of payment for yarn furnished by
   plaintiff to a textile corporation was binding under the "main purpose
   rule" because the corporation was a customer and debtor of a group
   of other textile companies owned and controlled by defendant's family
   where there was no evidence about how much or the type of business
   the corporation did with the other textile companies, who conducted
   it, whether it was for cash or credit, or what type of debt relationship,
   if any, existed between these various corporations.

3. Frauds, Statute of § 5— promise to pay for goods furnished corpora-
   tion — credit to promisor or corporation

   In an action to recover upon defendant's oral promise to pay for
   yarn furnished by plaintiff to a corporation, it was not necessary for
   the court to submit an issue as to whether the credit had been extended
   directly and exclusively to the defendant rather than to the corpora-
   tion where plaintiff alleged and the parties stipulated that defendant
   had personally guaranteed payment of the outstanding debt of the
   corporation.

4. Frauds, Statute of § 5— oral guaranty of payment — main purpose rule
   — insufficient interest in transaction

   Plaintiff's evidence was insufficient to support a jury finding
   that defendant's oral guaranty of payment for yarn furnished by
   plaintiff to a textile corporation was binding under the "main purpose
   rule" where it showed only that defendant was an officer, director
   and minority shareholder of the corporation and that defendant paid
   $25,000 of the debt to plaintiff with his personal check on behalf
   of the corporation and thereby became a creditor of the corporation.

**5. Corporations § 25; Guaranty— guaranty by corporation**

While a North Carolina corporation may enter into a contract of guaranty, such guaranty must be made in connection with the carrying out of the corporation's chartered purpose. G.S. 55-17(b)(3).

**6. Corporations § 8— authority of corporation's president**

The authority of the president of a corporation to act for the corporation is limited to those matters that are incidental to the business in which the corporation is engaged; that is, to matters that are within the corporation's ordinary course of business.

**7. Corporations § 8—authority of corporation's president — necessity for approval of board of directors**

Generally, when some act is undertaken by the president of a corporation that relates to material matters that are outside the corporation's ordinary course of business, in the absence of express authorization for such act by the board of directors, the corporation is not bound.

**8. Corporations § 8; Guaranty— guaranty by corporation's president — absence of approval by board of directors — effect on corporation**

Defendant textile corporation was not bound by its president's oral guaranty of payment of another company's account with plaintiff where there was no evidence that the guaranteeing of another company's account was part of the ordinary business conducted by defendant corporation and there was no showing that the president had authority from defendant's board of directors to guarantee the account.

ON *certiorari* to review the decision of the Court of Appeals reported in 19 N.C. App. 172, 198 S.E. 2d 194 (1973), which affirmed the judgment of *McConnell, J.,* entered at the 4 December 1972 Regular Civil Session of Cabarrus Superior Court. This case was docketed and argued as No. 88 at the Fall Term 1973.

Plaintiff seeks to recover $55,577.58 with interest from 22 September 1971, the balance due plaintiff for the sale of polyester yarn to Colonial Fabrics, Inc. (hereinafter referred to as Colonial), a North Carolina corporation that went into involuntary bankruptcy on or about 28 October 1971.

Stipulations entered into by the parties include the following: (1) Defendant Foil was a stockholder, director, and treasurer of Colonial at all times relevant hereto; (2) defendant Taylor was a stockholder, director, and secretary of Colonial at all times relevant hereto; (3) defendant Tuscarora Cotton Mill (hereinafter referred to as Tuscarora) is a North Carolina corporation; (4) defendant Foil is, and was at all times relevant hereto, a shareholder, director and the president of Tuscarora;

(5) defendant Taylor is, and was at all times relevant hereto, a shareholder, director, and the executive vice president of Tuscarora; (6) on or about 6 April 1971, and on various dates thereafter, up to and including 22 May 1971, plaintiff contracted to sell and did sell Colonial polyester yarn valued at $126,191.79; (7) under the terms of such sales, the account of Colonial became delinquent on 6 June 1971, and has remained delinquent at all times since that date, and there has been due and owing since 22 September 1971 the amount of $55,577.58.

Plaintiff's complaint alleges that the three defendants are jointly and severally liable for this amount since plaintiff extended credit to Colonial in reliance on defendants' guaranties of payment of Colonial's account. Specifically, plaintiff's complaint alleges that defendant Tuscarora guaranteed payment for the yarn sold by plaintiff to Colonial, and that defendants Foil and Taylor also each personally guaranteed to plaintiff the payment of the Colonial account. Plaintiff further alleges that in reliance upon the personal guaranties from Foil and Taylor, plaintiff refrained from taking legal action against Colonial and Tuscarora, despite the large amount of the indebtedness and the length of time it had been outstanding. Plaintiff finally alleges that despite frequent demands by plaintiff of Colonial and each of the three defendants, none of these defendants have paid anything except a $25,000 payment personally made by Taylor on 16 September 1971.

The answers filed by each of the defendants are substantially identical. They deny the guaranties alleged to have been made to plaintiff and allege that plaintiff's complaint fails to state a claim against defendants upon which relief can be granted. The answers also specifically plead two defenses: first, that no consideration of any sort was given by plaintiff to defendants for any guaranty by defendants of the credit extended Colonial, and that consequently any guaranty made by defendants is not binding on defendants; and secondly, that plaintiff's complaint alleges agreements and guaranties by defendants to answer for the debt of another, and that since these purported agreements and guaranties were never in any writing signed by defendants or by their authorized agents, they are unenforceable under the provisions of G.S. 22-1.

Defendants' answers admit that none of the defendants have paid plaintiff for the account of Colonial, and further allege that the purported $25,000 personal payment by Taylor

was not a payment by Taylor on his own behalf but rather was a loan by Taylor to Colonial. Defendants further allege that plaintiff through its officer and agent, J. Houston Barnes, entered into contracts and sold polyester yarn directly to Colonial and extended credit directly to Colonial; that thereafter plaintiff through its agent Barnes attempted to persuade defendants to enter into guaranties of the credit of Colonial, and that these defendants consistently refused to do so and advised plaintiff that it must look directly to Colonial for payment of Colonial's account.

The evidence presented tends to establish the following: Colonial was organized in December 1970 by defendants Foil and Taylor, Edwin B. Fowler III, and Foy Brooks. The corporation commenced business on 1 January 1971 with a capitalization of $3,000, and by March 1971 fifty percent of Colonial's stock was owned by its president and general manager, Fowler, and the remaining fifty percent was owned equally by defendants Foil and Taylor and Mrs. Jean M. Foil, defendant Foil's mother.

Colonial did very well during its first four or five months of operation and was able to meet the payments to its creditors out of the corporation's profits. During this period of successful operation by Colonial—specifically toward the end of March 1971—a salesman from plaintiff corporation came by to see Fowler about the possibility of Colonial's purchasing some yarn from plaintiff. Fowler proposed purchasing some yarn on a 60-day basis; that is, Colonial would pay for the yarn sixty days after receiving it. The salesman assured Fowler that this would be acceptable if Colonial's financial condition warranted such a credit arrangement, and accordingly Fowler placed an order for yarn with plaintiff.

. At this time Barnes was serving as plaintiff's credit manager. This job entailed the approving of credit for all new and existing customers before shipments were made by plaintiff. By 30 March 1971 plaintiff had received several orders for yarn from Colonial, and on that day Barnes contacted Fowler by telephone about plaintiff's extending credit to Colonial on a 60-day basis. Fowler explained the nature of Colonial's operation and informed Barnes that Fowler's "associates in this business, his partners, Mr. Martin Foil, Jr., and Mr. William Taylor, and Tuscarora, would guarantee the account." Fowler also stated that there was no financial statement on Colonial available, to

which Barnes replied that in the absence of such a statement credit could not be extended to Colonial. Fowler then suggested that Barnes call Foil.

After his conversation with Fowler on 30 March 1971, Barnes ordered a Dun and Bradstreet National Credit Office investigation of Tuscarora and Colonial. Barnes then—prior to contacting Foil—approved the credit extension to Colonial, and plaintiff started shipping goods to Colonial. This was on 6 April 1971, and by this time the double knit market in which Colonial was primarily involved had begun to deteriorate because of a flood of double knit goods on the market.

On 19 April 1971 Barnes contacted Foil for the first time by telephone. By this time plaintiff had already shipped yarn valued at $44,541.72 to Colonial. Barnes told Foil about his 30 March 1971 conversation with Fowler and, according to Barnes, the following transpired:

> "I [Barnes] told Mr. Foil in our conversation on April 19th that we had already started shipping on the strength of the guarantee that we already had. Mr. Fowler wanted to increase the program. Mr. Foil said, 'Well, don't increase the program. I'm trying to get him [Fowler] to clear all these things with me before he does it.' I said, 'I haven't even seen a statement on Colonial Fabrics.' He said, 'I'll have Ed [Fowler] send you one.' I said, 'I'm going to guess without even seeing it, it won't justify the credit we are talking about.' He said, 'You are exactly right.' And I said, 'You know we are looking to Tuscarora Cotton Mills and you, Martin Foil, for payment.' And he said, 'Yes, I understand that.' "

Barnes further testified that following this conversation he sent Foil the following letter on 20 April 1971 concerning their conversation:

> "Confirming our telephone conversation yesterday, we are enclosing a form, in duplicate, by which Tuscarora Cotton Mills, Inc., will guarantee the account of Colonial Fabrics, Inc. Please complete both sides of the form returning one copy to us, the extra copy is for your files. If you have any questions regarding the form, please let me know. It's nice to be back in touch with you and hope we can get together again before too long."

Foil did not complete this corporate guaranty and return it to Barnes or reply to the 20 April 1971 letter. There was no further correspondence between Barnes and Foil. Barnes testified, "I did not receive back any written corporate guaranty, or any written guaranty of any type from any defendant in this case." Consequently, on 11 May 1971 Carl M. Aycock, Barnes' assistant, terminated shipments of yarn to Colonial.

The next contact between plaintiff and any of the defendants occurred on either 13 May or 15 May 1971 when Barnes again telephoned Foil. At this time plaintiff had already shipped yarn valued at $106,835.47 to Colonial. Barnes stated at trial:

> "I called Mr. Foil and told him I understood he was not actually going to sign the guarantee form. He [Foil] said, 'That's right, Tuscarora'—he was advised by counsel on a loan agreement that he could not sign it, 'but it does not change anything. I have already told you Tuscarora was standing behind this, and you have nothing to worry about.' This was on May 15, 1971. He never told me after his conversation of April 19th that Tuscarora or he was not guaranteeing this account. The gentleman never did tell me that they were not guaranteeing, he did not ever tell me that."

After his conversation Barnes instructed Aycock "to commence shipment to Colonial Fabrics based upon the fact that the written guaranties could not be signed by Tuscarora Cotton Mills, and that Mr. Martin Foil had given his verbal guarantee." Shipments were again commenced and plaintiff sent Colonial more yarn valued at $19,356.32 between 13 May 1971 and 22 May 1971. On 22 May 1971 Barnes stopped shipments to Colonial.

Apparently the next contact between plaintiff and any of the defendants occurred during the middle or last part of June 1971 when Barnes again telephoned Foil. At this time plaintiff had completed its shipments to Colonial and Colonial's account with plaintiff was past due. According to Barnes, Foil suggested that he go see Fowler, to which Barnes replied:

> ". . . I didn't extend Colonial Fabrics credit, or Ed Fowler credit, I don't know either one of them, I extended this credit to you, Tuscarora Cotton Mills. He [Foil] said, 'That's right, but I would still like for you to go up and meet Ed [Fowler], and visit with him and, frankly, get

your opinion of what you think of it.' He said, 'I don't know what you are worried about because I have already told you Tuscarora and I were standing behind this.' "

On 3 September 1971, at Foil's suggestion, Barnes met with Taylor, Colonial's secretary, and Fowler in Colonial's office in Kannapolis. Barnes' description of this meeting is as follows:

"I met with Mr. Taylor on that date. I had received a [$25,000] check but it had been returned for insufficient funds. The check was drawn on Colonial Fabrics. I told Mr. Taylor and Mr. Fowler that I was very much upset about this, and Mr. Taylor told me to redeposit the check, and he assured me that it would clear. He also outlined the fact that he had taken an active part in the management, and he intended to be there on a daily basis, and that he would see that I was paid. I believe his words were, 'I'll see you paid.' That was Mr. Taylor talking to me. The amount due at that time was approximately $105,000.00."

According to Fowler, Colonial's president and general manager, Barnes wanted full payment from Colonial on 3 September 1971. Colonial had around $55,000 of accounts receivable at the time, and Fowler, Taylor, and Barnes reached an agreement that Colonial would send the proceeds from these accounts to plaintiff as they came in. Taylor confirmed this plan of payment in a letter dated 3 September 1971 addressed to Barnes.

Barnes again met with Taylor and Fowler on either 9 or 16 September 1971. Pursuant to Taylor's instructions given on 3 September 1971, Barnes had redeposited Colonial's check for $25,000. Barnes testified that at this meeting he informed Taylor and Fowler that the check had been returned unpaid again, and that he "was getting considerable pressure and my company [plaintiff] was not going to stand for this; and unless we could get adequate assurance they would take it out of my hands and would probably start legal action." Taylor then gave Barnes a personal check for $25,000. This check was made payable to plaintiff corporation and on the check Taylor noted that it was for "Payment on Colonial Fabrics' Account." Barnes also testified that after Taylor gave him the check, Taylor again said "he would see me paid" and offered to call Barnes' superiors in New York to assure them of this.

Other facts pertinent to this decision are set out in the opinion.

After plaintiff rested, the three defendants made a motion for a directed verdict pursuant to Rule 50 of the North Carolina Rules of Civil Procedure on the basis that:

". . . [T]he evidence of the plaintiff fails to justify a verdict for the plaintiff as to each of the defendants. More specifically, the evidence affirmatively shows that there was no written guarantee on the part of either of the defendants; that the evidence fails to show that the plaintiff has brought itself outside the statute of frauds as pleaded by the defendants. . . ."

The presiding judge allowed defendants' motion for a directed verdict and entered judgment for defendants. Plaintiff appealed to the Court of Appeals, and that court in an opinion by Judge Campbell, concurred in by Judges Hedrick and Baley, affirmed the judgment. We allowed *certiorari* on 2 October 1973.

*Sanford, Cannon, Adams & McCullough by E. D. Gaskins, Jr., Robert W. Spearman, and J. Allen Adams for plaintiff appellant.*

*Williams, Willeford & Boger by John Hugh Williams; Jordan, Wright, Nichols, Caffrey & Hill by Lindsay R. Davis, Jr., and Charles E. Nichols for defendant appellees.*

MOORE, Justice.

Plaintiff first alleges that defendant Foil personally guaranteed Colonial's account and that credit was extended to Colonial in reliance on Foil's personal guaranty.

"A guaranty of payment is an absolute promise by the guarantor to pay a debt at maturity if it is not paid by the principal debtor. This obligation is separate and independent of the obligation of the principal debtor, and the creditor's cause of action against the guarantor ripens immediately upon the failure of the principal debtor to pay the debt at maturity." *Investment Properties v. Norburn,* 281 N.C. 191, 188 S.E. 2d 342 (1972).

Plaintiff contends that Foil's oral guaranty is not within North Carolina's statute of frauds because Foil had a direct, immediate, and pecuniary interest in Colonial's transactions with plaintiff. The North Carolina statute of frauds, G.S. 22-1, provides in pertinent part:

"No action shall be brought . . . to charge any defendant upon a special promise to answer the debt, default or miscarriage of another person, unless the agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party charged therewith or some other person thereunto by him lawfully authorized."

North Carolina has long recognized an exception to the statute of frauds, generally referred to as either the "main purpose rule" or the "leading object rule." In discussing this exception this Court has often quoted with approval the following language from *Emerson v. Slater,* 63 U.S. (22 How.) 28, 43, 16 L.Ed. 360, 365 (1859) :

". . . [W]henever the main purpose and object of the promisor is not to answer for another, but to subserve some pecuniary or business purpose of his own, involving either a benefit to himself, or damage to the other contracting party, his promise is not within the statute, although it may be in form a promise to pay the debt of another, and although the performance of it may incidentally have the effect of extinguishing that liability."

See, *e.g., Warren v. White,* 251 N.C. 729, 112 S.E. 2d 522 (1960) ; *Garren v. Youngblood,* 207 N.C. 86, 176 S.E. 252 (1934) ; *Handle Co. v. Plumbing Co.,* 171 N.C. 495, 88 S.E. 514 (1916) ; *Dale v. Lumber Co.,* 152 N.C. 651, 68 S.E. 134 (1910).

Some of the various situations in which the main purpose rule has been applied in North Carolina are reviewed in Note, *Statute of Frauds—The Main Purpose Doctrine in North Carolina,* 13 N.C.L. Rev. 263 (1935). Generally, if it is concluded that the promisor has the requisite personal, immediate, and pecuniary interest in the transaction in which a third party is the primary obligor, then the promise is said to be original rather than collateral and therefore need not be in writing to be binding. Professor Lee, in North Carolina Law of Suretyship 12 (3d Ed. 1970), notes that the main purpose rule is applicable when a court has determined that the promisor's "answering for the debt or default of another is merely incidental to his broader purposes. He is participating in the principal contract and making its obligation his own. The expected advantage to the promisor must be such as to justify the con-

clusion that his main purpose in making the promise is to advance his own interests."

Plaintiff's evidence relating to Foil's personal guaranty reveals that on 19 April 1971, after plaintiff had already shipped Colonial yarn valued at approximately $45,000, and on subsequent occasions thereafter, Foil made oral guaranties to personally stand behind Colonial's account with plaintiff. Plaintiff asserts that the evidence presented is sufficient to indicate Foil's direct, immediate, and pecuniary interest in Colonial's transactions with plaintiff, in that it reveals Foil was treasurer of Colonial, one of its four directors, and a "major stockholder." Plaintiff's evidence discloses, however, that at all times relevant to the transactions between Colonial and plaintiff, Fowler was the controlling shareholder in Colonial, owning 50% of Colonial's capital stock, and that Foil owned only 75 of the 450 shares, or one-sixth, of Colonial's outstanding capital stock.

Plaintiff also contends that Foil was vitally interested in the success of Colonial because Colonial was a customer and debtor of a group of other textile corporations owned and controlled by the "Foil family." This group included Tuscarora, Colonial Threads, Oakboro Cotton Mills, and Fashion Knits. Because of these "interlocking business enterprises," plaintiff asserts that Foil stood to gain personally if Colonial obtained materials from plaintiff, sold them, and paid its debts to Foil's family businesses.

The question then becomes: Considering plaintiff's evidence as true, has plaintiff offered evidence sufficient as a matter of law to justify a verdict for plaintiff on the ground that the main purpose rule is applicable so that Foil's promise though oral was binding? We think not.

Two quotations from Annot., 35 A.L.R. 2d 906 (1954) point out an important distinction recognized by our decisions:

> "As applied to promises by stockholders, officers, or directors, to pay a debt of the corporation, it may be said that the promise is original where the promisor's primary object was to secure some direct and personal benefit from the performance by the promisee of his contract with the corporation, or from the latter's refraining from exercising against the corporation some right existing in him by virtue of the contract. *The benefit to the promisor is to be distinguished from the indirect benefit which would accrue to*

*him merely by virtue of his position as a stockholder, officer, or director.* If the benefit accruing is direct and personal, then the promise is original within the rule above discussed, and the validity thereof is not affected by the statute of frauds." (Emphasis added.) *Id.* at 910.

"Where an oral promise by a stockholder, officer, or director of a corporation is collateral in form and effect, and the consideration was not intended to secure or promote some personal object or advantage of the promisor— as distinguished from the benefit accruing to a person from the mere fact of his being a stockholder, officer, or director—, the promise is collateral and within the statute of frauds." *Id.* at 914.

This language was quoted with approval by Justice Bobbitt (now Chief Justice) in *Warren v. White, supra.* It expresses the majority rule that the benefit to be derived from one's ownership of stock or holding the position of an officer or director is too indirect or remote to invoke the application of the main purpose rule. Something more—some other expected benefit or advantage to be gained by making the promise—is required to make the main purpose rule applicable. See 49 Am. Jur., Statute of Frauds § 110 (1943); Annot., 35 A.L.R. 2d 906 (1954); Annot., 8 A.L.R. 1198 (1920); Calamari and Perillo, The Law of Contracts § 288 (1970); 2 Corbin on Contracts § 372 (1950); Lee, North Carolina Law of Suretyship 13 (3d Ed. 1970); Simpson on Suretyship 143-44 (1950).

This principle is recognized in the North Carolina cases in which shareholders have been held liable under the main purpose doctrine. In *May v. Haynes,* 252 N.C. 583, 114 S.E. 2d 271 (1960), plaintiffs sought to hold the president of a corporation liable for certain construction work done by plaintiffs. Although it was determined that the president of the corporation had contracted for the work in his own individual capacity rather than just as a surety for the corporation, Justice Bobbitt (now Chief Justice) in discussing the main purpose rule noted that the defendant had a personal, immediate and pecuniary interest in the transaction. This was partly shown by the fact that the defendant owned 41 of the 43 shares of the corporation's capital stock (his wife owning the remaining two shares), and was the president and general manager of the corporation.

In *Warren v. White, supra,* defendant was the owner of a corporation in serious financial difficulty. The defendant hired

plaintiff as a general manager, orally promising him at the inception of plaintiff's employment that he would "personally pay" plaintiff for any sums plaintiff might advance to the failing corporation. The corporation then failed, and plaintiff sued for the advancements he had made. The evidence revealed that defendant was the incorporator and owner of almost all the corporation's capital stock. Additionally, after plaintiff became general manager, defendant had personally advanced more than $23,000 to the corporation in an attempt to save it. Justice Bobbitt, in holding that the statute of frauds was not applicable to defendant's promise, noted: "There can be no doubt but that defendant was personally, directly and pecuniarily interested in the continuance in business of the corporation and would be the prinipal beneficiary if this were accomplished and the principal loser if it were forced out of business."

In *Garren v. Youngblood, supra,* the plaintiff was allowed to recover on an oral agreement by defendant that he would be personally responsible for any loss plaintiff might sustain if her funds were permitted to remain on deposit with a bank. The evidence there revealed that defendant was the bank's vice president, a director, and a shareholder. Additionally, defendant had a substantial deposit with the bank which he stood to lose in the event the bank failed.

[1] Plaintiff's evidence in the instant case fails to establish any such direct interest on the part of Foil in Colonial's transactions with plaintiff. To the contrary, plaintiff's own evidence reveals that other than through his interest as a minority shareholder, officer, and director of Colonial, Foil's interest in Colonial was limited. Foil's investment in Colonial was only $750. The protection of this investment would hardly justify his guaranteeing credit for Colonial that ultimately reached $125,000. If his only expected benefit or advantage in making the guaranty was to protect this interest, then his promise to guarantee Colonial's debts must be considered within the statute of frauds, since such an interest is too indirect and remote to invoke application of the main purpose rule.

Plaintiff further contends, however, that the question of whether there was a direct, immediate, and pecuniary interest sufficient to hold Foil liable is a question of fact to be decided by the jury. In support of this position, plaintiff cites *Farmers Federation, Inc. v. Morris,* 223 N.C. 467, 27 S.E. 2d 80 (1943),

and *Peele v. Powell,* 156 N.C. 553, 73 S.E. 234 (1911), rev'd on rehearing, 161 N.C. 50, 76 S.E. 698 (1912).

In *Farmers Federation, Inc. v. Morris, supra,* it was alleged that defendant induced plaintiff to furnish goods to a corporation engaged in the restaurant business upon defendant's promise that he would be personally responsible for all the corporation's bills. Defendant admitted to being the corporation's president and a stockholder, but the court refused to allow further examination into the defendant's connection with the corporation. In reversing the case and ordering a new trial, this Court stated:

> "Whether a promise is an original one not coming within the statute of frauds, or a collateral one required by the statute to be in writing, is to be determined from the circumstances of its making, the situation of the parties, and the objects sought to be accomplished. *Simmons v. Groom,* 167 N.C., 271, 83 S.E., 471; *Balentine v. Gill,* 218 N.C., 496, 11 S.E. (2d), 456; *Dozier v. Wood,* 208 N.C., 414, 181 S.E., 336. Where the intent is doubtful, the solution usually lies in summoning the aid of a jury. *Whitehurst v. Padgett,* 157 N.C., 424, 73 S.E., 240. The issue was properly submitted to the jury in the instant case. *Taylor v. Lee,* 187 N.C., 393, 121 S.E., 659; *Peele v. Powell,* 156 N.C., 553, 73 S.E., 234, on rehearing, 161 N.C., 50, 76 S.E., 698.

> \*    \*    \*

> "In respect of the character of the promise, it was competent to show that the defendant had a personal, immediate and pecuniary interest in the transaction. *Balentine v. Gill, supra; Whitehurst v. Padgett, supra.* For this purpose, it was proper to inquire about his entire connection with the corporation.

> "In excluding the evidence offered and limiting the cross-examination to the time of the purchase of the supplies, the jury was left without a full knowledge of the facts and denied information regarding the defendant's long-continued interest in the business which would have thrown some light on the matter. 'Anything which shows the intention or the actual contract of the parties is material, and any evidence which goes to show the intention of the parties is admissible whether it be by way of conduct or documentary in nature.' 34 Cyc., 980. . . . "

There was no exclusion of any evidence in the instant case. It is apparent that the Court in *Farmers Federation, Inc. v. Morris, supra,* was simply setting forth the rule that all pertinent information necessary to the application of the main purpose rule is relevant and should be admitted. If, however, there is insufficient evidence as a matter of law to bring the main purpose rule into play, the case should not be allowed to go to the jury under the theory of the main purpose rule.

This point is illustrated by one of the cases on which plaintiff relies, *Peele v. Powell, supra.* In that case plaintiff sued defendant, a landlord, on an alleged promise by defendant to stand for supplies furnished his tenant. The Court there had to decide as a matter of law whether a landlord generally has a sufficient personal, immediate, and pecuniary interest in the successful operation of his farm by his tenant to take the landlord's promise to pay the tenant's debt out of the statute of frauds by reason of the main purpose rule. The Court originally held that there was no evidence of any such benefit or interest in the landlord, and therefore refused to let the case go to the jury, although the Court in so doing noted that a jury would have been justified in finding from the evidence that the promise had in fact been made. On a petition for rehearing, the Court reconsidered and decided that there was sufficient evidence of such a benefit to require submission of the case to the jury. See also *Handle Co. v. Plumbing Co., supra.* Similar landlord and tenant cases are *Dozier v. Wood,* 208 N.C. 414, 181 S.E. 336 (1935) ; *Tarkington v. Criffield,* 188 N.C. 140, 124 S.E. 129 (1924) ; *Taylor v. Lee,* 187 N.C. 393, 121 S.E. 659 (1924) ; *Whitehurst v. Padgett,* 157 N.C. 424, 73 S.E. 240 (1911).

[1, 2]  We hold that plaintiff's evidence about Foil and his relationship with Colonial fails to establish the required direct interest on the part of Foil in Colonial's transactions with plaintiff. The only interest plaintiff's evidence—when considered as true—establishes is one that is too indirect and remote to invoke application of the main purpose rule. Plaintiff's evidence about Foil's interest in Colonial because of his alleged interest in the related textile concerns is also insufficient to support the conclusion that Foil had a personal, immediate, and pecuniary interest in Colonial's transactions with plaintiff. There is no evidence about how much or the type of business Colonial did with Tuscarora, Colonial Threads, Oakboro Cotton Mills, and Fashion Knits, who conducted it, whether it was for cash or

credit, or what type debt relationship, if any, existed between these various corporations. In summary, plaintiff has failed to offer any evidence that, even with the benefit of every reasonable intendment and inference arising therefrom, tends to show any personal, immediate, and pecuniary benefit or advantage to Foil other than that naturally accruing to him as a shareholder, director, or officer. Therefore, plaintiff's evidence was insufficient as a matter of law to justify a verdict for plaintiff on the basis of the main purpose rule.

[3] Having determined that the main purpose rule is not applicable to the present facts, the sole issue remaining to be decided is whether Foil's alleged promise can otherwise be considered an original, rather than a collateral, promise. In this connection this Court has often quoted with approval the following language from Clark on Contracts 67-68 (2d Ed. 1904):

> "There must be either a present or prospective liability of a third person for which the promisor agrees to answer. If the promisor becomes himself primarily, and not collaterally, liable, the promise is not within the statute, though the benefit from the transaction accrues to a third person. If, for instance, two persons come into a store, and one buys, and the other, to gain him credit, promises the seller, 'If he does not pay you, I will,' this is a collateral undertaking, and must be in writing; but if he says, 'Let him have the goods, and I will pay,' or 'I will see you paid,' *and credit is given to him alone, he is himself the buyer, and the undertaking is original. In other words, whether the promise in such a case is within the statute depends on how the credit was given. If it was given exclusively to the promisor, his undertaking is original; but it is collateral if any credit was given to the other party."* (Emphasis added.)

See also Annot., 20 A.L.R. 2d 246 (1951); 49 Am. Jur., Statute of Frauds §§ 63, 90 (1943); 2 Corbin on Contracts §§ 352, 353 (1950); 37 C.J.S., Statute of Frauds § 20 (1943). Many North Carolina cases have noted that it is for the jury to determine to whom credit was extended. In these cases if it was determined that the credit was extended directly and exclusively to the promisor, then the promise is considered original and not within the statute of frauds. See, *e.g., Rubber Corp. v. Bowen*, 237 N.C. 426, 75 S.E. 2d 159 (1953); *Balentine v. Gill*, 218 N.C. 496, 11 S.E. 2d 456 (1940); *Brown v. Benton*, 209 N.C. 285, 183 S.E. 292 (1936); *Parker v. Daniels*, 159 N.C. 518, 75 S.E. 712

(1912) ; *Jenkins v. Holley,* ·140 N.C. 379, 53 S.E. 237 (1906) ; *Sheppard v. Newton,* 139 N.C. 533, 52 S.E. 143 (1905) ; *White v. Tripp,* 125 N.C. 523, 34 S.E. 686 (1899). See also *Dozier v. Wood, supra; Tarkington v. Criffield, supra; Taylor v. Lee, supra; Whitehurst v. Padgett, supra,* cases in which the Court discussed the main purpose rule in conjunction with the above-noted principle.

It was unnecessary in this case, however, for a jury to determine to whom credit was extended. In paragraphs 9 and 11 of plaintiff's complaint, admitted by Foil, it is alleged:

"9. On or about April 6, 1971, and on various dates thereafter, up to and including May 22, 1971, the plaintiff, contracted through its Madison Throwing Company Division, to sell and did sell and deliver to Colonial polyester yarn on account at the price of and in the total amount of $126,-191.79, as shown on the Accounts Receivable Ledger, marked Exhibit A, and attached hereto and made a part hereof."

"11. Under the terms of the sale, the account of Colonial became delinquent on June 6, 1971, and has remained delinquent at all times since that date, and there has been due and owing since September 22, 1971, the amount of $55,577.58."

Plaintiff's complaint also alleges:

"12. Subsequent to April 6, 1971, both Foil and Taylor personally guaranteed to plaintiff the payment of the outstanding debt of Colonial. . . . "

Stipulations to the same effect were entered into by the parties. Accordingly, there was never any question but that Colonial was the party to whom credit was extended. See 2 Corbin on Contracts § 353 at 236 (1950). Since the main purpose doctrine has no application to Foil's alleged guaranty to plaintiff, Foil's alleged promise to answer for the debt of Colonial is a collateral one, and since it was not in writing as required by G.S. 22-1, it is ineffective to bind Foil. Under these facts, Foil's motion for a directed verdict was appropriate.

A defendant's motion for a directed verdict at the close of plaintiff's evidence under G.S. 1A-1, Rule 50(a) presents substantially the same question formerly presented by a motion for involuntary nonsuit; that is, whether the evidence considered

in the light most favorable to plaintiff would justify a verdict in his favor. *Adler v. Insurance Co.*, 280 N.C. 146, 185 S.E. 2d 144 (1971); *Kelly v. Harvester Co.*, 278 N.C. 153, 179 S.E. 2d 396 (1971).

The decision of the Court of Appeals affirming the judgment of the trial court in directing a verdict in favor of defendant Foil is affirmed.

[4] Plaintiff also contends that defendant Taylor personally guaranteed Colonial's account, and that Taylor's oral guaranty is not within the statute of frauds because Taylor, like Foil, had a direct, immediate, and pecuniary interest in Colonial's transactions with plaintiff. Plaintiff's allegations in support of this contention are: first, Taylor was Colonial's secretary; secondly, Taylor was one of Colonial's four directors; thirdly, Taylor was a "major shareholder" of Colonial; and lastly, "Taylor paid part of the debt [$25,000] to [plaintiff] with his own personal check thereby demonstrating his direct interest and becoming a creditor of Colonial himself."

With respect to plaintiff's allegation that Taylor was a "major shareholder," it should be noted that at all times relevant to the transactions between Colonial and plaintiff, Taylor owned the same amount of Colonial's stock as did Foil; that is, 75 of the 450 shares, or one-sixth, of Colonial's outstanding capital stock. Therefore, with respect to plaintiff's contention about Taylor's interest as an officer, director, and a shareholder, that part of this opinion discussing the legal effect of Foil's similar interest in Colonial is controlling. Accordingly, we hold that this evidence is insufficient to invoke the application of the main purpose rule.

Plaintiff's other evidence concerning Taylor discloses that the first contact plaintiff had with Taylor was on 3 September 1971 when Taylor met with Barnes and Fowler at the office of Colonial. This was approximately three months after the last shipment from plaintiff to Colonial. Apparently the reason for this meeting was that Colonial's check to plaintiff had been returned for insufficient funds. At that time plaintiff was looking to Colonial for payment and had in fact received several payments on Colonial's account from Colonial. Prior to that time demand for payment of the Colonial account had not been made on anyone other than Colonial, and neither at this meeting nor a subsequent meeting on either 9 or 16 September 1971 was any

demand made upon anyone other than Colonial. At the 3 September 1971 meeting Taylor allegedly told Barnes that he was taking an active part in the management of Colonial and he would see that Barnes was paid. Barnes testified that he believed Taylor's words were, "I'll see you paid." Taylor was secretary for Colonial, and on this same date wrote Barnes a letter on Colonial's stationery in which he set forth a program for Colonial's payment of its account with plaintiff from the proceeds of Colonial's own accounts receivable.

On either 9 or 16 September 1971 Barnes again met with Taylor and Fowler at the office of Colonial. Colonial's check for $25,000 had been redeposited and had again been returned for insufficient funds. At this meeting Taylor gave Barnes his personal check for $25,000 payable to plaintiff, marked "For payment on Colonial Fabrics' Account." At the same time Fowler signed a written statement acknowledging that Colonial was indebted to Taylor in the amount of $25,000 for making this payment to plaintiff on behalf of Colonial. This written statement noted that the interest on the loan was to be for 6½% and that the loan was payable on demand. There was no further conversation after 16 September 1971 between Taylor and Barnes or between Taylor and anyone else representing plaintiff.

It is clear that the entire indebtedness of Colonial to plaintiff had accrued long before Taylor was even approached about the account. Taylor's only promise was to the effect that he would try to work it out so that Colonial could pay plaintiff; to assist Colonial he loaned the corporation $25,000 to pay plaintiff. Colonial at no time was released from the indebtedness, but plaintiff continued its efforts to collect from Colonial. Thus it is apparent that Taylor's alleged promise to personally pay Colonial's account, if made, was a collateral promise which is required to be in writing to withstand a plea of the statute of frauds.

There is not sufficient evidence to support plaintiff's allegation that it refrained from taking legal proceedings for collection of Colonial's account because of Taylor's alleged guaranty. Hence, this allegation need not be considered on this appeal.

Therefore, the evidence with respect to Taylor's alleged liability to plaintiff was insufficient to be submitted to the jury. The decision of the Court of Appeals affirming the judgment

of the trial court directing a verdict in favor of defendant Taylor is affirmed.

Plaintiff finally contends that the president of Tuscarora, Foil, orally guaranteed the Colonial account on behalf of Tuscarora, and that Tuscarora is bound by this guaranty.

[5]   Under North Carolina's Business Corporation Act, a North Carolina corporation may enter into a contract of guaranty. Such a guaranty must, however, be made in connection with carrying out the corporation's chartered purpose. G.S. 55-17(b)(3). See generally, Robinson, North Carolina Corporation Law and Practice § 14 at 47 (1964) [hereinafter cited as Robinson].

The business and affairs of a corporation are ordinarily managed by its board of directors. G.S. 55-24(a). In general, the directors establish corporate policies and supervise the carrying out of those policies through their duly elected and authorized officers. Robinson § 70.

The day-to-day business of a corporation is actually conducted by its officers, employees and other agents under the authority and control of its board of directors. Robinson § 98. Under G.S. 55-34(b), the officers of a corporation have such authority and may perform such duties in the management of the corporation as provided either specifically or generally in the bylaws, or as may be determined by action of the board of directors not inconsistent with the bylaws.

[6]   This Court has frequently held that the president of a corporation by the very nature of his position is the head and general agent of the corporation, and accordingly he may act for the corporation in the business in which the corporation is engaged. *Pegram-West v. Insurance Co.*, 231 N.C. 277, 56 S.E. 2d 607 (1949); *Mills v. Mills*, 230 N.C. 286, 52 S.E. 2d 915 (1949); *Warren v. Bottling Co.*, 204 N.C. 288, 168 S.E. 226 (1933). The authority of the president to act for the corporation is limited to those matters that are incidental to the business in which the corporation is engaged; that is, to matters that are within the corporation's ordinary course of business. *Pegram-West v. Insurance Co., supra; Trust Company v. Transit Lines*, 198 N.C. 675, 153 S.E. 158 (1930); *Brimmer v. Brimmer & Co.*, 174 N.C. 435, 93 S.E. 984 (1917).

[7]  Generally, when some act is undertaken by the president that relates to material matters that are outside the corporation's ordinary course of business, in the absence of express authorization for such act by the board of directors, the corporation is not bound. See *Tuttle v. Building Corp.*, 228 N.C. 507, 46 S.E. 2d 313 (1948); *Brinson v. Supply Co.*, 219 N.C. 498, 14 S.E. 2d 505 (1941); *Warren v. Bottling Co.*, *supra*; *Stansell v. Payne*, 189 N.C. 647, 127 S.E. 693 (1925); Robinson §§ 98, 99; 2 Strong, N. C. Index 2d, Corporations § 8 (1967). As stated in *Brinson v. Supply Co.*, *supra*, "[f]or a contract executed by the officer of a corporation to be binding on the corporation it must appear that (1) it was incidental to the business of the corporation; or (2) it was expressly authorized; and (3) it was properly executed." And in *Tuttle v. Building Corp.*, *supra*, it is stated:

> "In the absence of a charter or bylaw provision to the contrary, the president of the corporation is the general manager of its corporate affairs. *Phillips v. Land Co.*, 174 N.C., 542, 94 S.E., 12; *Trust Co. v. Transit Lines*, 198 N.C., 675, 153 S.E., 158; *White v. Johnson and Sons, Inc.*, 205 N.C., 773, 172 S.E., 370; *Lumber Co. v. Elias*, 199 N.C., 103, 154 S.E., 54; *Warren v. Bottling Co.*, 204 N.C., 288, 168 S.E., 226. His contracts made in the name of the company in its general course of business and within the apparent scope of his authority are ordinarily enforceable. 2 Fletcher, Cyc. Corporations, 467, sec. 592; *Huntley v. Mathias*, 90 N.C., 101; *Wynn v. Grant*, 166 N.C., 39, 81 S.E., 949; *Powell v. Lumber Co.*, 168 N.C., 632, 84 S.E., 1032; *Brimmer v. Brimmer*, 174 N.C., 435, 93 S.E., 984. But, usually, he has no power to bind the corporation by contract in material matters without express authority from the directors or stockholders. *Lumber Co. v. Elias*, *supra*; 2 Fletcher Cyc. Corporations, 440, sec. 557."

See also 19 Am. Jur. 2d, Corporations § 1170 (1965); Annot., 34 A.L.R. 2d 290 (1954).

[8]  Plaintiff's evidence shows that Tuscarora is in the textile industry. There is no evidence that the guaranteeing of another corporation's account is part of the ordinary business conducted by Tuscarora. In *Stansell v. Payne*, *supra*, the president of a bank executed a note for $2,000 in the name of another corporation in which he had an interest. He then endorsed the note for

the bank as president. The bank had no interest in the corporation that borrowed the money and had not authorized the president to endorse the note for it. The note was not paid, and the payee brought suit against the bank on the endorsement. This Court, in reversing judgment for plaintiff, stated:

" . . . Defendant [bank] is liable for the acts of its [president], T. J. Payne, only when within the scope of his authority, express or implied. It is plaintiff's misfortune that she made no inquiry as to the authority of the president to endorse the note. She had notice that he was acting, in this transaction, not in the interest of defendant bank, but in the interest of himself, or at least of a third party— Carolina Farms & Development Company. She acted in good faith, and believed the endorsement made upon said note, in name of defendant, by its president valid. This fact elicits sympathy for her, but cannot fix defendant with liability for the unauthorized act of T. J. Payne."

In the present case plaintiff apparently realized it was only by authorization of Tuscarora's board of directors that Foil could guarantee the account of Colonial for Tuscarora. This is shown by letter of 20 April 1971 from Barnes, credit manager for plaintiff, to Foil, president of Tuscarora, which reads as follows: "Confirming our telephone conversation yesterday, we are enclosing a form, in duplicate, by which Tuscarora Cotton Mills, Inc., will guarantee the account of Colonial Fabrics, Inc. Please complete both sides of the form returning one copy to us, the extra copy is for your files. . . . " This guaranty form, after setting forth the controlling features of the guaranty, provided for the signature of a corporate officer, a place for a notary public to verify such signature and to further verify that the signature was "so affixed by order of the board of directors of said corporation and that he signed his name thereto by like order." Another portion of the guaranty provided for the secretary's certificate relating to a resolution of the board of directors authorizing the corporate guaranty. Tuscarora refused to execute this guaranty form. Despite this refusal, plaintiff continued to make shipments to Colonial.

Throughout Colonial's transactions with plaintiff, Fowler, president and general manager of Colonial, owned 50% of Colonial's stock. This ownership arrangement renders G.S. 55-22(a)(2) and G.S. 55-22(b) inapplicable to the alleged guaranty

by Tuscarora, and these statutes are not considered in this opinion.

Plaintiff further contends that Tuscarora should be held liable on the oral promise by Foil because Tuscarora had an immediate and pecuniary interest in plaintiff's sales to Colonial. The record fails to show what pecuniary interest, if any, Tuscarora had in Colonial. There is no evidence about how much or the type of business Tuscarora did with Colonial, who conducted it, whether it was for cash or credit, or what type of debt relationship, if any, existed between the two corporations. Regardless of Tuscarora's interest, however, the failure of plaintiff to show that Foil had authority from Tuscarora's board of directors to guarantee the account of Colonial bars plaintiff's right to recover against Tuscarora. The Court of Appeals correctly affirmed the directed verdict entered by the trial court in favor of Tuscarora.

The decision of the Court of Appeals as to all the defendants is affirmed.

Affirmed.