UNPUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

GENERAL ELECTRIC CAPITAL BUSINESS
ASSET FUNDING CORPORATION,
            *Plaintiff-Appellant,*

v.                                                     No. 01-1614

GOLDEN CORRAL CORPORATION; S. S.
RESTAURANT CORPORATION,
            *Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Terrence W. Boyle, Chief District Judge.
(CA-99-225-5BO(2))

Argued: October 31, 2001

Decided: December 28, 2001

Before WILKINS, NIEMEYER, and LUTTIG, Circuit Judges.

Affirmed by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** Robin Kenton Vinson, SMITH, ANDERSON, BLOUNT,
DORSETT, MITCHELL & JERNIGAN, L.L.P., Raleigh, North Car-
olina, for Appellant. Keith Harrison Johnson, POYNER & SPRUILL,
L.L.P., Raleigh, North Carolina, for Appellees. **ON BRIEF:** J. Mitch-
ell Armbruster, SMITH, ANDERSON, BLOUNT, DORSETT,
MITCHELL & JERNIGAN, L.L.P., Raleigh, North Carolina, for

Appellant. Andrew O. Whiteman, HARTZELL & WHITEMAN, Raleigh, North Carolina, for Appellees.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

General Electric Capital Business Asset Funding Corporation ("GE Capital") sued Golden Corral Corporation and its sister corporation, S. S. Restaurant Corporation, to collect from them a debt of several million dollars on loans made to Golden Corral franchisees. On cross-motions for summary judgment, the district court entered judgment in favor of Golden Corral and S. S. Restaurant. We affirm.

I

GE Capital is the successor in interest on ten loans made by Metropolitan Life Capital Corp. ("MetLife") to Corral Northeast ("CNE") and Corral Midwest ("CMW"). CNE and CMW are subsidiaries of Corral America, Inc., which in turn is a subsidiary of Golden Corral. They are also Golden Corral franchisees, owning numerous family-style restaurants franchised by Golden Corral.

Because of financial difficulties in operating its family-style restaurants, Golden Corral decided in the 1980s to franchise its underperforming restaurants rather than sell them outright. In 1993, it approached MetLife about funding its franchising program, assuring MetLife that Golden Corral would "attempt to assist [its] franchisees with meeting their financial needs" by providing franchisees with lists of lenders to contact. Golden Corral stated that it was "willing to commit [its] resources (without recourse to Golden Corral)" to help the franchisees and that it would provide limited guarantees for some loans, based on the amount of the loan and other specified guidelines.

In reviewing Golden Corral's proposal, MetLife generated internal review documents which stated that MetLife would consider making loans to Golden Corral franchisees that had two years of restaurant experience "in the event that Golden Corral will provide limited recourse for the obligation." These internal documents observed that "Golden Corral has indicated that they may be willing to provide a 10% guaranty of the principal."

Despite these observations in its internal documentation, MetLife wrote to Golden Corral on July 20, 1994, that it would provide franchisee financing under MetLife's Franchising Financing Program in an amount up to $10 million, referring in its letter only to "possible support by Golden Corral." Thereafter, MetLife negotiated a Master Loan Agreement, as well as specific loan documents, with CNE and CMW. Golden Corral did not provide any guarantees, nor was it signatory to any of the loan documents; indeed, the documents did not even reference Golden Corral. The Master Loan Agreement included a cross-default provision that permitted MetLife, in the event of a default by CNE or CMW, "to enter any premises where any Collateral is situated and take possession thereof without notice or demand and without legal proceedings."

In 1997, as Golden Corral expanded its franchise program, it requested an additional $5 million of funding from MetLife for Golden Corral franchisees. In its request, Golden Corral stated that it would not "guarantee any of the franchisee obligations."

Beginning in 1996, Golden Corral's franchisees began to suffer financially, and Golden Corral decided to restructure the franchising program to bail out some of the franchisees through a "1996 Restructuring." Under the restructuring arrangement, Golden Corral's sister corporation, S. S. Restaurant, signed an Asset Purchase and Assumption Agreement with CNE under which S. S. Restaurant purchased five underperforming restaurants (the "Whitehall Restaurants") from CNE. It paid for the five restaurants by assuming "all liabilities and obligations of [CNE] relating to the operation of [the five] Restaurants." The loans made to the Whitehall Restaurants never went into default.

Several other loans made by MetLife to CNE and CMW, however, went into default. GE Capital, as successor in interest to MetLife,

commenced this action in January 2000 against Golden Corral and S. S. Restaurant to collect on the loans that MetLife had made to Golden Corral's franchisees and that were in default. It sued not only for breach of contract, but also on an agency theory, asserting that the defaulting franchisees were Golden Corral's agents. It also alleged claims against Golden Corral and S. S. Restaurant for negligence and mismanagement and against Golden Corral for negligent misrepresentation.

The district court rejected all of GE Capital's claims and entered judgment in favor of Golden Corral and S. S. Restaurant. From the judgment entered, GE Capital filed this appeal.

## II

GE Capital contends first that Golden Corral, as a principal, is vicariously liable for the acts and omissions of both its franchisees and S. S. Restaurant, as agents. This claim relies on both actual and apparent agency. The district court dismissed this claim under Federal Rule of Civil Procedure 12(b)(6) because it failed to state a claim upon which relief could be granted. We affirm this ruling. GE Capital's complaint does not allege any facts that would demonstrate that, when CNE and CMW executed the notes with MetLife, they were acting on behalf of Golden Corral. Nor does its complaint allege that Golden Corral authorized these franchisees to enter into loan agreements that would bind Golden Corral.

GE Capital next contends that Golden Corral and S. S. Restaurant are contractually liable to repay the franchisees' defaulted loans, either by reason of the 1996 Restructuring or by reason of oral statements made by Golden Corral's executives in 1994. Again, this claim has no merit.

As an initial matter, it is undisputed that Golden Corral did not sign the Master Loan Agreement between MetLife and CNE and CMW, and there is no evidence that Golden Corral expressly assumed the loan obligations of these franchisees. Although MetLife's internal documentation referring to Golden Corral's original funding proposal stated that Golden Corral "may be willing to provide a 10% guaranty" for some of the loans and MetLife's financing approval letter said that

there would be "possible support by Golden Corral" for the loans, there is simply no evidence that Golden Corral ultimately agreed to assume the loan obligations. In fact, the evidence is to the contrary. Golden Corral explicitly stated that it would financially assist its franchisees *only* in finding lenders, and it wrote MetLife that it "does not guarantee any of the franchisee obligations." Furthermore, in a 1999 demand letter that GE Capital sent to Golden Corral with respect to the defaulted loans, GE Capital requested specifically that Golden Corral at that time undertake to guarantee the loans, a recognition that GE Capital knew that Golden Corral had not previously done so.

GE Capital also attempts to rely on oral statements by Golden Corral's officers in 1994. When MetLife's vice president Steere was asked whether "anybody with Golden Corral ever promised [him] that MetLife would get paid on loans that it made to Corral Northeast or Corral Northwest," he answered, "[n]ot in those words." But Steere testified that "it was implied that these companies [CNE and CMW] had every bit of support from Golden Corral" and that he was told by someone at Golden Corral that no lender had ever lost money financing Golden Corral's franchisees. These vague statements suggesting that MetLife's risk would be low, however, are not sufficient to form binding contracts by Golden Corral to repay millions of dollars in debt that it never undertook to repay.

Moreover, such oral statements are unenforceable under North Carolina's statute of frauds. *See* N.C. Gen. Stat. § 22.1 (requiring that a "promise to answer the debt, default, or miscarriage of another person" be in writing). GE Capital contends that an exception to the statute of frauds applies under the "main purpose" or "leading object" rule where "the promisor has the requisite personal, immediate, and pecuniary interest in which a third party is the primary obligor." *Burlington Industries, Inc. v. Foil*, 284 N.C. 740, 748 (N.C. 1974). In those circumstances, "the promise is said to be original rather than collateral and therefore need not be in writing to be binding." *Id.* GE Capital argues that the doctrine is applicable to this case because Golden Corral stood to earn royalties from CNE and CMW when their loans were approved. GE Capital, however, presented no evidence that shows that Golden Corral had such a royalty agreement with the franchisees. Additionally, any such royalties would be based on future

profits and therefore Golden Corral could not have an "immediate" interest in such royalties.

GE Capital also contends that Golden Corral and S. S. Restaurant assumed the loans during the 1996 Restructuring. This contention, however, is belied by the language of the applicable documents involved in the 1996 Restructuring. In those documents, S. S. Restaurant assumed only the loans associated with the five Whitehall Restaurants, and those loans were not in default and therefore were not the subject of this litigation.

On its claim for negligence, GE Capital contends that Golden Corral failed to supervise and manage its franchisees adequately, resulting in harm to GE Capital when the franchisees defaulted. But GE Capital has not been able to identify any legal duty that Golden Corral owed GE Capital to supervise and manage the Golden Corral franchisees. The district court correctly granted summary judgment for Golden Corral on this claim.

Finally, GE Capital contends that Golden Corral is liable to GE Capital for negligent misrepresentations made to MetLife. GE Capital asserts that Golden Corral represented to MetLife that Golden Corral would support and monitor its franchisees and that no lender had ever lost money lending money to Golden Corral's franchisees. The first alleged misrepresentation, however, was not a representation of fact but at most a promise to act in the future. In any event, there was no evidence to support the statement. Golden Corral only stated to MetLife that it would pre-approve the franchisees for participation in the franchise program. On the second alleged misrepresentation, GE Capital did not demonstrate the statement to be false. Accordingly, the district court correctly granted summary judgment on GE Capital's misrepresentation claim.

S. S. Restaurant filed a cross-claim for a declaratory judgment that it was not liable under the cross-default provision of the Master Loan Agreement, and the district court granted S. S. Restaurant a summary declaratory judgment. GE Capital also challenges that ruling on appeal. Again, we affirm the district court. Under the Master Loan Agreement between MetLife and CNE, a default on any "note" of the "debtor" creates default on all other "notes" of the "debtor" and per-

mits MetLife (or GE Capital) to seize the assets of the debtor. The agreement, however, defines "debtor" as CNE. Therefore, the cross-default provision applies only to defaults of CNE's loans. Since S. S. Restaurant did not default on any of the CNE loans and was current on the loans that it assumed, the cross-default provision does not apply to S. S. Restaurant. On the loans that it did not assume, S. S. Restaurant was not the "debtor," as defined under the Master Loan Agreement.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.