Plaintiff brought the action to recover certain personal property, with damages for its detention, and the amount of certain notes alleged to be due by defendants to it. The defendants Wooten Benigar [Renigar] were engaged in manufacturing handle slabs, which were used by the plaintiff in its business. Plaintiff contracted with Wooten Renigar to purchase from them all the handle slabs they could manufacture which were suitable for use in its mill, and in order to assist Wooten Renigar in making the slabs, plaintiff agreed to supply them with a certain amount of money to buy timber and to pay their employees, title to the slabs, bolts, and stumpage to be retained by plaintiff as security for the advances made by it. Slabs were manufactured and delivered to plaintiff under this contract, for which plaintiff paid $3,838.01, leaving a balance due by defendants Wooten Renigar of $589.72, as alleged, which was secured by a bill of sale for all handle timber then on the yards of the debtors. In order to make the handle slabs called for in the contract with the plaintiff it was necessary for the firm of Wooten Renigar to have certain machinery and other supplies which they proposed to buy from their codefendants, Crawford Plumbing and Mill Supply Company, called hereafter the Crawford Company, which contended that the superintendent of plaintiff's mill at Winston-Salem, N.C. had agreed for and in behalf of plaintiff to assume responsibility for the payment of the price of the machinery and supplies purchased by Wooten Renigar from the Crawford Company, and that this was done before the contract of purchase was made or any of the goods were delivered. This transaction is explained in the testimony of R. R. Crawford, as follows:
"Mr. Tatem, I think, was the first one mentioned it to me. He (497) said they had a man that they were going to start in business, to saw handles for them, and he wanted to know if I had a 20 or 25 h. p. engine and boiler that would suit them, and I told him I did; told him I had one in Statesville, 25 h. p., and in a few days Mr. Wooten and Mr. Renigar came to see me, and I asked them what terms they wanted to buy the rig on, and they said they might be able to pay $100 cash and the balance they would want some time on. So, then, a little later — I think probably the same day — I think they brought Mr. Tatem with them. I don't know whether it was the same day or the next day — along about that time. It was the Mr. Tatem of the Handle Company. He *Page 562 
was superintendent at that time, and we talked the matter over and finally agreed that this outfit would suit them, and Mr. Tatem said: `These men haven't anything, but we are going to start them in business; they are going to saw timber for us, and I will see that you get your money,' and he would see that we got pay for the outfit.
"He said a good deal. I couldn't say exactly as to anything else at that time. I don't remember of anything else he said right at that time. Then Wooten Renigar said they would be back to get the boiler and engine in the course of a week or something like that, and at the end of the week they were to come and pay $100 cash and the balance was to be notes, three, six, and nine months. At the end of the time they came back and didn't have the money. They had not been able to raise the $100, and Mr. Tatem told me: `You go ahead and let them have it, and I will see that you get your $100 inside of a short while, next week or two.' So we let them have the boiler and engine; told him he could go and get the boiler and engine at Statesville. That was about 25 miles from their point of business.
"We sold them the boiler and engine and what is included in the chattel mortgage. I can't give the exact language Mr. Tatem used when he spoke about letting them have the boiler and engine, but the substance of it was, `We will see that you get your money.' That's as near as I can state it. I can't say that he used the name of the Handle Company, except that he said he was acting as the agent for the Kelly Handle Company. Tatem was working for the Kelly Handle Company. I had had a conversation with him before that about it. He is the first man that came to see me about the outfit. He said Wooten Renigar wanted to buy a boiler and engine. He said they had no money. I did not know them. I don't think I had ever seen them before. I possibly might have seen Mr. Wooten before that time. He worked at the Handle Company before that. I let them have it because the Kelly Handle Company said they would be responsible for it. The amount of the bill for the (498) boiler and engine was $450, and of that amount they were to pay $100 cash and give two $125 notes and another note for $100."
The judge excluded, by his ruling, from the consideration of the jury the question as to plaintiff's indebtedness to the Crawford Company based upon the evidence relating thereto, upon the ground, as stated in the argument, that the alleged contract of plaintiff with the Crawford Company was within the statute of frauds and should have been in writing. Issues covering this feature of the case were tendered by the Crawford Company, but rejected by the court, and the company excepted.
Plaintiff caused to be issued claim and delivery process under which the property mortgaged to the Crawford Company to secure the debt *Page 563 
due by Wooten Renigar to it was seized, the Crawford Company contending that, as the mortgage was made to it, the possession was rightfully in it at the time of the seizure under the writ, which was, therefore, illegal, and especially so as it owned one or more of the notes secured by the mortgage, one of the notes for $128.75 secured by the mortgage having been transferred by the Crawford Company in writing on the back thereof, to the plaintiff, together with another note for $101, which, as plaintiff alleges, was represented by the Crawford Company as also secured by the mortgage, though in fact it was not. The Crawford Company contended that the note for $128.75 was transferred by it merely to pass the title thereto, as against Wooten Renigar, to the plaintiff, without any understanding or intention by the parties that it should make the company liable as indorser.
This statement, we think, will be sufficient to explain the issues and the nature of the matters in controversy between the parties.
The jury, upon the issues submitted by the court, returned the following verdict:
1. Are the defendants Wooten Renigar indebted to the plaintiff? If so, in what sum? Answer: "Yes; $819.47."
2. Is the plaintiff the owner of the handle timber, saw-rig, belting, and other property used in connection with the milling business of Wooten 
Renigar, as alleged in the complaint? If so, what was its value at the time of the bringing of this suit? Answer: "Yes; $192."
3. Did the defendants, or either of them, destroy or appropriate to their own use the handle timber, saw-rig, belting, and other property used by them in their milling business? If so, what is the value of the same? Answer: "`Yes' as to the handle timber; `No' as to the saw-rig, belting, etc.; value unknown."
4. Is the defendant Crawford Plumbing and Mill Supply Company liable to the plaintiff by reason of its indorsement of the notes, as alleged in the complaint? If so, in what sum? Answer: "No."
5. Are the notes or either of them which are described in the (499) complaint secured by the chattel mortgage to the Crawford Plumbing and Mill Supply Company, as alleged in the complaint? Answer: "Yes.; one note, $128.75."
6. Did the defendant the Crawford Plumbing and Mill Supply Company represent to the plaintiff that the $100 note sued on, originally executed by Wooten Renigar to Crawford Plumbing and Mill Supply Company, was secured by chattel mortgage upon the sawmill and boiler in the same manner as the $128 note, and did Kelly Handle Company take over and pay the Crawford Plumbing and Mill Supply Company $101 of said note upon the understanding and in the belief that it *Page 564 
was secured by the chattel mortgage, as alleged in the complaint? Answer: "Yes."
7. In what amount, if anything, is the defendant indebted to the plaintiff on said note? Answer: "$101."
8. What was the value of the property conveyed in the chattel mortgage to the Crawford Plumbing and Mill Supply Company, at the time it was levied on in the claim and delivery proceedings? Answer: "$300."
9. What is the value of the property conveyed in the chattel mortgage to the Crawford Plumbing and Mill Supply Company at this time? Answer: "$150."
After ascertaining the amount of plaintiff's claim against Wooten 
Renigar, the court entered judgment therefor, and then decreed that the chattel mortgage be foreclosed to pay the debts secured thereby, and a commissioner was appointed to sell the same, if the $128.75 was not paid by the defendants on or before a date fixed in the judgment. The court further adjudged that plaintiff recover of defendants Wooten Renigar the handle timber, saw-rig, beltings, and other property mentioned, and unless the same was delivered to plaintiff it should recover on the redelivery bond such damages as it had sustained by the detention, deterioration, or destruction of the same. There were directions for the recovery of damages upon the other issues, depending upon whether or not the property described in the mortgage to the Crawford Company was delivered up for the purpose of sale under the judgment. There was also a recovery by plaintiff against the Crawford Company for the amount of the $101 note. Defendants were adjudged to pay the costs. The Crawford Company excepted to certain rulings of the court and to its judgment, and appealed.
After stating the case: There was no appeal in this case by Wooten Renigar, and we are confined, therefore, to the (500) questions arising on the appeal of the Crawford Company, which may be reduced conveniently to three heads:
First. Is the plaintiff bound by the contract of its general superintendent, viz., that if the Crawford Company would let Wooten 
Renigar have the engine, boiler, and fittings they needed to carry on their business and manufacture the handle slabs or handle blanks for the plaintiff, the latter would see that the company was paid for the same? It is true that a general agent has no power, merely as such, to agree that his principal will stand for the performance of another's contract, as by guaranteeing the payment of a note given by a third party; but *Page 565 
the rule of liability is different where the promise is an original one made for the purpose of advancing the interest of the real promisor, or where, as in this case, the corporation in whose behalf the promise is made has a direct and beneficial interest to be subserved by the performance of the principal contract, and especially where the guaranty is necessary, or requisite, to the performance of that contract, and there is evidence that the agent has ostensibly been clothed with the power thus to contract, and the promisee is induced to enter into the contract and, in this case, furnish the materials by reason of the promise that payment will be made by the corporation for which the promise was made, by its agent, and which will be specially benefited if the goods are sold by the promisee.
1 Corpus Juris, pp. 641 to 644, says, at sections 285 and 287: "In the absence of anything to show a different intention, the power to make or indorse commercial paper will be construed as extending only to bills, notes, or drafts executed or indorsed in the business of the principal and for his benefit. The broadest possible authority to make and indorse paper presumptively is to be exercised in the principal's interest only, and does not impliedly extend to making or indorsing paper for the accommodation of third persons, and still less for the agent himself. . . . It will be sufficient to bind the principal for acts or contracts by the agent, that they were reasonably necessary to keep the property in good repair, or the business a going concern, or to protect the interests confided to the management of the agent; and when the principal leaves the agent as his sole representative in doing the business, third persons are justified in relying on his acts as to matters that would naturally devolve on the principal in such a business. One who is put in the place of a general manager is thereby clothed with his powers."
Substantially the same view is thus expressed in 31 Cyc., pp. 1386, 1387: "Agency to manage implies authority to do with the property what has been previously done with it by the owners, or others with their express or implied consent; or, further, to do with it what is usual and customary to do with property of the same kind in the same locality. But in the absence of a grant of such power in specific terms, no power to do acts beyond the ordinary needs of the principal's (501) business is to be inferred from the use in his authorization of general terms of the broadest import. Thus an agent is not authorized to make permanent additions or improvements to the property under his control, or to grant any easements or licenses, or impose other burdens upon his principal's property. But it will be sufficient to bind the principal for contracts by the agent that they were reasonably necessary to keep the property in good repair, or the business a going concern, or to protect the interests confided to the management of the agent. And when *Page 566 
the principal leaves the agent as his sole representative in doing the business, third persons are justified in relying on his acts as to matters that would naturally devolve on the principal in such a business. One who is put in the place of a general manager is thereby clothed with his powers. Since it is the agent's business to keep the business a going concern, he has no implied authority to take steps for its winding up or to sell it out."
Speaking of the implied power of a general agent to make or indorse a bill so as to bind his principal, it was said in Bank v. Johnson, 33 S.C. (3 Rich.), at p. 46: "The use of negotiable securities so universally prevails in trade as the means of credit that, from Wray's general agency, his power may be inferred to make bills and notes in the defendant's name in payment of his liabilities in the course of business, and in like manner to take such securities in settlement of debts due, and to negotiate and discount them. But this authority of the agent to bind his principal as a party to bills and notes must be restricted to such as derive a consideration from liabilities contracted by the agent in the course of trade, or from the direct use and application of them for the convenience or necessities of the business."
The same was held in regard to the authority of a superintendent of a mining corporation, in Stuart v. Adams, 89 Cal. 367.
There is evidence here that some of the handle blanks made with the machines sold by defendant, the Crawford Company, have been seized by the plaintiff, and it claims the right to have received more of them, and this claim is still insisted upon, even after notice of the alleged agreement between its superintendent and the Crawford Company.
We are of the opinion that there was evidence sufficient to take the case to the jury upon the authority of Tatem, the superintendent, to make the promise of payment.
Second. This being so, the promise, if made as alleged, was not within the statute of frauds, but it was an original promise founded upon a distinct consideration moving to the plaintiff at the time, and was not simply collateral and superadded to that of Wooten Renigar to pay the debt.
Our case falls within the principle stated in Dale v. Lumber Co., 152 N.C. 651, where the matter is clearly stated by Justice Hoke, (502) who, quoting from the well considered case of Emerson v. Slater, 63, U.S., 28, at p. 43, said: "Whenever the main purpose and object of the promisor is not to answer for another, but to subserve some pecuniary or business purpose of his own, involving either a benefit to himself or damage to the other contracting party, his promise is not within the statute, although it may be in form a promise to pay the debt of another, and although the performance of it may incidentally *Page 567 
have the effect of extinguishing that liability. This position has been sustained and applied in other cases of the same Court, notably in Davis v.Patrick, 141 U.S. 479, in which it was held: `In determining whether an alleged promise is or is not a promise to answer for the debt of another, the following rules may be applied: (1) If the promisor is a stranger to the transaction, without interest in it, the obligations of the statute are to be strictly upheld; (2) but if he has a personal, immediate, and pecuniary interest in a transaction in which a third party is the original obligor, the courts will give effect to the promise. The real character of a promise does not depend altogether upon form of expression, but largely upon the situation of the parties, and upon whether they understood it to be a collateral or direct promise.'" The position is also sustained by decisions in other jurisdictions, which are cited in the Dale case, and the general doctrine has been frequently recognized and approved by this Court.Deaver v. Deaver, 137 N.C. 241; Threadgill v. McLendon, 76 N.C. 24;Voorhees v. Porter, 134 N.C. 591-605; Mason v. Wilson, 84 N.C. 51;Whitehurst v. Hyman, 90 N.C. 487.
In Voorhees v. Porter, supra, the Court, in referring to Mason v.Wilson, supra, closely follows the case of Emerson v. Slater, supra, in its language, for it is said: "The doctrine there stated is that if a third person promise the debtor to pay his antecedent debts in consideration of property placed in the hands of the promisor by the debtor for the purpose, which is afterwards converted into money, the creditors may recover on the promise as for money had and received, for, although, says the Court, the promise is in words to pay the debt of another, and the performance of it discharges that debt, still the consideration was not for the benefit or ease of the original debtor, but for a purpose entirely collateral, so as to create an original and distinct cause of action; and it is immaterial, as is further said by the Court, whether the liability of the original debtor is continued or not, the promise being an independent and original one founded upon a new consideration and binding upon the promisor. . . . When the promise to pay the debt of another arises out of some new and original consideration of benefit or harm moving between the original contracting parties, the creditor may sue the promisor, whether his debtor remains liable to him or not." (503)
The principle is repeated in Peele v. Powell, 156 N.C. 553, whereJustice Allen has stated the law upon this subject fully and with apt and clear discrimination between those cases which are and those which are not affected by the statute of frauds. It is there said that if the promise is based on a consideration, and is an original obligation, it is valid, although not in writing. The obligation is original if made at the time or before the debt is created, and the credit is given solely to the *Page 568 
promisor; or if credit is given on the promises of both, as principals and as jointly liable, and not on the promise of one as the surety for the other; or if a promise is based on a new consideration of benefit or harm passing between the promisor and the creditor. We here reproduce the language of that case which bears more directly upon the evidence in this record: "Where the promise is for the benefit of the promisor, and he has a personal, immediate, and pecuniary benefit in the transaction, as in Nealv. Bellamy, 73 N.C. 384, and in Dale v. Lumber Co., 152 N.C. 653; or where the promise to pay the debt of another is all or part of the consideration for property conveyed to the promisor, as in Hockaday v.Parker, 53 N.C. 17; Little v. McCarter, 89 N.C. 233; Deaver v. Deaver,137 N.C. 242; Satterfield v. Kindley, 144 N.C. 455; or is a promise to make good notes transferred in payment of property, as in Adcock v.Fleming, 19 N.C. 225; Ashford v. Robinson, 30 N.C. 114, and in Rowlandv. Rorke, 49 N.C. 337, the promise is valid, although in parol. If, however, the promise does not create an original obligation, and it is collateral, and is merely superadded to the promise of another to pay the debt, he remaining liable, the promisor is not liable unless there is a writing; and this is true, whether made at the time the debt is created or not." Citing numerous cases.
We have evidence here which tends to show (and we must view all of it most favorably for the Crawford Company) that the promise, if made by the plaintiff, was for its benefit and advantage. The engine, boiler, and fittings were needed by Wooten Renigar to manufacture the handle blanks or slabs, which in their turn were needed by the plaintiff to carry on its business; and moved by this consideration of benefit or profit to itself, it induced the Crawford Company to part with its property to Wooten 
Renigar by the promise on plaintiff's part to see that they were paid for. If this be the case, the statute does not apply. Kanter v. Hofheimer,88 S.E. 60.
It follows from this view of the matter that the court erred in not submitting the question as to the promise, and plaintiff's liability thereon, to the jury.
Third. The question as to the right of the plaintiff to seize the property under claim and delivery proceedings depends upon whether the original mortgage of Wooten Renigar to the Crawford Company (504) secured, at the time of the seizure, more than one note. The defendant contends that when the new notes and mortgage were taken from Renigar, after the dissolution of the firm of Wooten Renigar, the Crawford Company did not surrender the first mortgage given by Wooten Renigar, while the plaintiff contends, as we understand their position, that it was given up by the Crawford Company and the new notes and mortgage of Renigar taken in the place thereof, and, this *Page 569 
being so, that only the note for $128.75 was then secured by that mortgage, and that the Crawford Company had agreed with plaintiff to transfer both the note for $128.75 and the mortgage securing it to the plaintiff. If the first mortgage still subsisted in favor of the Crawford Company and secured two notes, one of which belonged to it and the other to the plaintiff, we do not see how plaintiff can claim the possession of the property covered by the mortgage to the exclusion of the Crawford Company, both being equally interested in it and the mortgage having been made to the latter company.
Where there is only one note secured by a chattel mortgage the authorities conflict upon the question as to whether a transfer of the note will carry the mortgage with it to the extent of conferring on the transferee the right to sue in replevin for the property. Cobby on Replevin, sec. 186, refers to the conflict as follows: "The assignment of the note carries the mortgage with it, notwithstanding that it may not be a legal transfer of the mortgage. The debt and the security are inseparable, and cannot reside at the same time in different parties; and he who controls the debt also controls the mortgage. I am aware that this is a disputed question, and that Jones says, `The mortgagee's legal interest does not pass by his assignment of the debt. Such assignee cannot maintain replevin in his own name for the mortgaged property, though he may, in the absence of any express or implied stipulation to the contrary, bring such action in the name of the motgagee [mortgagee], who holds, in such case, the legal title in trust for such assignee's benefit.' But this evidently puts the case of a single note secured by a chattel mortgage."
We are not required in this case to select between these conflicting views, as the court decided peremptorily as to the right of plaintiff to recover the property and instructed only upon the rule of damages as it is in an action of replevin. As the case goes back for a new trial, the facts may be ascertained more clearly in this respect, and a proper issue submitted for the finding of the jury in regard to them. There was error, as above indicated, in the rulings of the court, on account of which a new trial becomes necessary, and it will extend to all the issues.
New trial.
Cited: Charlotte v. Alexander, 173 N.C. 518 (2c); Mercantile Co. v.Bryant, 186 N.C. 554 (2c); Jennings v. Keel, 196 N.C. 681 (2c); Coxe v.Dillard, 197 N.C. 346 (2c); Garren v. Youngblood, 207 N.C. 89 (2c); Gennettv. Lyerly, 207 N.C. 205 (2e); Balentine v. Gill, 218 N.C. 499 (2e). *Page 570 
(505)