IN THE SUPREME COURT OF NORTH CAROLINA

No. 29A24

Filed 20 March 2026

SMITH DEBNAM NARRON DRAKE SAINTSING & MYERS, LLP

v.

PAUL MUNTJAN

Appeal pursuant to N.C.G.S. § 7A-30(2) (2023) from the decision of a divided panel of the Court of Appeals, 292 N.C. App. 141 (2024), reversing a judgment entered on 3 November 2022 by Judge Ned Mangum in District Court, Wake County. Heard in the Supreme Court on 24 September 2024.

*Smith Debnam Narron Drake Saintsing & Myers, L.L.P., by Byron L. Saintsing and Joseph A. Davies, for plaintiff-appellant.*

*Mark Hayes for defendant-appellee.*

BARRINGER, Justice.

This Court considers whether the Court of Appeals erred by reversing the trial court's judgment in favor of plaintiff. We hold that the Court of Appeals erred, because defendant's emails to plaintiff satisfy the statute of frauds requirement that a contract to pay a third party's debt "be in writing, and signed by the party charged." *See* N.C.G.S. § 22-1 (2025). Therefore, we reverse the judgment of the Court of Appeals.

## I.    Background

Plaintiff, Smith Debnam Narron Drake Saintsing & Myers, LLP, is a law firm. Nick Muntjan is the owner of a construction business called Triangle Home Remodeling, LLC (THR). Defendant, Paul Muntjan, is Nick's father. In 2019, Nick and defendant met with Byron Saintsing, a partner at plaintiff law firm, to discuss securing plaintiff's services for Nick and THR. At this meeting, prior to the engagement of plaintiff, defendant orally promised to pay for plaintiff's services.

In September 2019, approximately one month after that meeting, plaintiff prepared and delivered an engagement letter addressed to defendant and Nick. Neither defendant nor Nick signed that letter. However, less than a week after the engagement letter was delivered, defendant responded to plaintiff via email, writing the following:

> Received your email as addressed to son Nick regarding the case and request for prompt payment. It is important to us to always pay our valued partners quickly for their services rendered so rest assured your invoice will be turned around immediately and a check sent upon receipt. Please note as of this date no invoice has been received. As a reminder, please insure [sic] any and all invoices are sent to my email due to my travel schedule.

The email was signed, "Best Regards, Paul Muntjan."

In December 2019, Nick was served with a complaint filed against him and THR. Defendant emailed the complaint to plaintiff and wrote: "It looks like the saga continues with Nick's legal issues with his business. I am attaching the legal

document he just received for your review. Please let me know how we can best work together in this regard."

Plaintiff received some payments made through defendant's credit card for services rendered. In June 2020, defendant replied to plaintiff's request for additional payment with another email asking: "Would you be so kind to furnish a list of the payments made on this account? We may be missing a payment made on, or about 1/10/20."

In mid-July, in reply to another email from plaintiff, defendant asked for further clarity on legal fees, writing: "Thank you all sincerely for your great work on behalf of my son Nick! The finances and the stress from this situation have been profound and a major setback on many levels. Would this $3000 be the cap you mentioned could be achieved[,] Mr. Saintsing?" Mr. Saintsing, on behalf of plaintiff, answered: "Yes, we would agree to cap the fees for responding to the discovery at $3,000.00." In response, defendant wrote: "It sounds like [d]iscovery would be the last item we need to deal with now that we have the bankruptcy being considered?"

Approximately six months later, plaintiff emailed and mailed a notice to defendant and Nick requesting payment of the outstanding balance of $13,528.06 for legal services rendered. That balance remains unpaid.

## II. Procedural History

To collect the unpaid fees, plaintiff filed the underlying lawsuit against defendant alleging various breach of contract claims. Following a bench trial, the trial

court found that "[defendant] promised to pay for [p]laintiff's services." The trial court then concluded that defendant breached an "original promise" to plaintiff, not a "special promise to answer the debt . . . of another person." Therefore, the statute of frauds did not apply, and no writing was required to enforce defendant's promise to pay.

Defendant appealed the trial court's judgment, and the Court of Appeals reversed. *Smith Debnam Narron Drake Saintsing & Myers, LLP v. Muntjan*, 292 N.C. App. 141, 142, 148 (2024). A majority of the Court of Appeals panel disagreed with the trial court's conclusion of law that defendant made an "original promise" to plaintiff. *Id.* at 145. Instead, the majority held that defendant made a "collateral promise"—a guaranty—to pay Nick's debts. *Id.* After noting that collateral promises must satisfy the statute of frauds to be enforceable, *id.* at 145–46, the majority determined that defendant's guaranty was unenforceable, *id.* at 148. It held that defendant's emails to plaintiff failed to satisfy the statute of frauds, because they did not express a clear, written promise that defendant would personally pay plaintiff. *Id.* at 147–48.

Although the dissent agreed that the statute of frauds was applicable, it would have held that the statute of frauds' requirements were satisfied by the emails. *Id.* at 149 (Arrowood, J., dissenting). In other words, defendant's emails constituted a writing sufficient to make enforceable defendant's oral promise to personally pay Nick's debts. *Id.* at 150.

Plaintiff filed a notice of appeal based on the dissent in the Court of Appeals.[1]

### III.　Standard of Review

Because defendant's appeal is based solely upon the Court of Appeals' dissent, our review is limited to those issues set out in the dissenting opinion. *See* N.C. R. App. P. 16(a). Accordingly, this Court reviews only the Court of Appeals' legal conclusion that defendant's oral guaranty to pay Nick's debt for plaintiff's legal services is unenforceable because defendant's emails do not satisfy the statute of frauds.

"Questions of law receive *de novo* review . . . ." *In re Appeal of The Greens of Pine Glen Ltd. P'ship*, 356 N.C. 642, 647 (2003). " 'Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment' for that of the lower tribunal." *State v. Williams*, 362 N.C. 628, 632–33 (2008) (quoting *In re Appeal of The Greens of Pine Glen Ltd. P'ship*, 356 N.C. at 647).

### IV.　Analysis

Defendants have not challenged the trial court's finding of fact that "[defendant] promised to pay for [p]laintiff's services," and we are bound by this fact on appeal. *See Schloss v. Jamison*, 258 N.C. 271, 275 (1962) ("Where no exceptions have been taken to the findings of fact, such findings are presumed to be supported

---

[1] Since this case was pending at the Court of Appeals before the repeal of N.C.G.S. § 7A-30(2), the dissent triggered a right of appeal to this Court under that statute. *See* N.C.G.S. § 7A-30(2) (2023), *repealed by*, Current Operations Appropriations Act of 2023, S.L. 2023-134, § 16.21(d)–(e), 2023 N.C. Sess. Laws 760, 1171.

by competent evidence and are binding on appeal."). This, however, does not end our inquiry, as an oral guaranty[2] contract cannot be enforced unless the statute of frauds is satisfied. *See* N.C.G.S. § 22-1.

Thus, this Court considers whether defendant's emails, in which defendant assured he would personally pay for plaintiff's services, satisfy the statute of frauds. We hold that defendant's emails are a "memorandum or note" of defendant's promise sufficient to satisfy the statute of frauds. *See* N.C.G.S. § 22-1. Accordingly, we reverse the judgment of the Court of Appeals.

It has been long and well established that the statute of frauds "was not enacted to afford persons a means of evading just obligations; it was not intended to supply a cloak of immunity to hedging litigants lacking integrity; nor was it adopted to enable defendants to interpose the Statute [of Frauds] as a bar to a contract fairly, and admittedly, made." 10 *Williston on Contracts* § 29:4 (4th ed. 2011) (footnotes omitted); *see also Manhattan Fuel Co. v. New England Petrol. Corp.*, 422 F. Supp.

---

[2] Of course, to the extent that defendant may have made an *original* promise to pay, it is not subject to the statute of frauds. *See Burlington Indus., Inc. v. Foil*, 284 N.C. 740, 752, 754 (1974) ("If the promisor becomes himself primarily, and not collaterally, liable, the promise is not within the statute [of frauds] . . . ." (quoting *Clark on Contracts* 67–68 (2d ed. 1904))). However, as correctly pointed out by Justice Dietz, we cannot rule on whether defendant made an original promise, as the dissent upon which plaintiff gave notice of appeal does not discuss original promises in any way. *See Mitchell v. Univ. of N.C. Bd. of Governors*, 388 N.C. 341, 350 (2025).

The *only* reason such a distinction is relevant here is to determine whether a statute of frauds analysis is even necessary. *See* 72 Am. Jur. 2d *Statute of Frauds* § 3 (2023) ("The statute of frauds is an affirmative defense that carves out an exception to the general rule that oral contracts are enforceable . . . ."). In any event, because the statute of frauds was indeed satisfied, defendant is obliged to fulfill his promise to pay, regardless of whether that promise is best thought of as being original or collateral.

797, 801 (S.D.N.Y. 1976) ("[The statute of frauds] was never meant to be used as a means of evading just obligations based on contracts fairly, and admittedly, made." (extraneities omitted)); *House v. Stokes*, 66 N.C. App. 636, 641 (1984) ("The statute of frauds was designed to guard against fraudulent claims supported by perjured testimony; it was not meant to be used by defendants to evade an obligation based on a contract fairly and admittedly made.").

Defendant's main contention is that because his emails do not *expressly* say "I promise to pay for services rendered to Nick," they do not satisfy the statute of frauds. This argument misapprehends the fact that the statute of frauds only requires sufficient written *evidence* of an agreement's essential terms—not that the agreement *itself* be written.

In relevant part, our State's statute of frauds provides:

> No action shall be brought whereby to charge . . . any defendant upon a special promise to answer the debt, default or miscarriage of another person, unless the agreement upon which such action shall be brought, *or some memorandum or note thereof*, shall be in writing, and signed by the party charged . . . .

N.C.G.S. § 22-1 (emphasis added). Importantly, the statute's plain language does not require the *guaranty agreement itself* to be in writing to be enforceable. *See id.* Rather, an oral guaranty is also enforceable if "some memorandum or note thereof" is produced "in writing, and signed by the party charged." *Id.* The memorandum "may be informal[,]" and it "need not be contained in a single document but may consist of several papers properly connected together." *Smith v. Joyce*, 214 N.C. 602, 604 (1939).

"The memorandum itself need not constitute a contract, and apart from its effect as a writing sufficient to enable proof of a contract—that is, to remove the alleged agreement from the Statute of Frauds—it may have no legal significance." 10 *Williston on Contracts* § 29:3. Rather, the memorandum must merely perform an adequate *evidentiary* function. *See Phillips v. Hooker*, 62 N.C. (Phil. Eq.) 193, 196 (1867) ("[A] note or memorandum of a contract is, in its very essence, an informal and imperfect instrument. Its object is to furnish aid to the memory of a transaction, and . . . it will answer the purpose . . . if it do so in such words as will enable the court, without danger of mistake, to declare the meaning of the parties."); *Gilbert v. Wright*, 195 N.C. 165, 167 (1928) (same); *see also McInerney v. Charter Golf, Inc.*, 680 N.E.2d 1347, 1351 (Ill. 1997) ("[The statute of frauds] functions more as an evidentiary safeguard than as a substantive rule of contract."); *Gagne v. Stevens*, 696 A.2d 411, 415 (Me. 1997) (noting that the "primary" purpose of the Statute of Frauds is "evidentiary"); Restatement (Second) of Conts. § 131 cmt. c (A.L.I. 1981) ("The primary purpose of the Statute [of Frauds] is evidentiary . . . .").[3]

For this reason, the memorandum need not contain *all* contractual terms to satisfy the statute of frauds; an adequate evidentiary function is performed so long as the *essential* terms are shown.[4] For example, a memorandum of a guaranty

---

[3] Although the foreign authorities cited in this opinion are not controlling, this Court finds them to be persuasive.

[4] The dissents insist that the statute of frauds is not satisfied unless the memorandum is not susceptible to multiple interpretations. Tellingly, neither dissent cites *any* authority that directly supports this proposition. That is because it is not the law. A memorandum need

agreement can satisfy the statute of frauds even if it does not describe the consideration. *Standard Supply Co. v. Person*, 154 N.C. 456, 461 (1911). Instead, a memorandum of a guaranty agreement need only identify the debt, the principal debtor, the promisor, and the promisee. *See John Deere Co. v. Haralson*, 599 S.E.2d 164, 166 (Ga. 2004). So long as these essential terms are shown by a writing, the contract will be enforceable.

To interpret the statute of frauds as defendant contends would render the statutory language "or some memorandum or note thereof" mere surplusage. This Court's precedent demands otherwise. *See State v. Geter*, 383 N.C. 484, 491 (2022) (explaining and applying the surplusage cannon). Statutory language is to be interpreted in a way that, if possible, gives effect to every word. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 174–79 (2012) (explaining that application of the surplusage canon is to give every word effect and refuse to interpret a provision as having no consequence). We give effect to this statutory language by holding that a memorandum—even an informal email[5]—outlining the essential terms of an oral agreement satisfies the statute of frauds. *See* 10 *Williston on Contracts* § 29:3 ("The difference between requiring that the contract

---

only *evidence* the agreement—not detail its every element with certitude beyond dispute. *See Norton v. Smith*, 179 N.C. 553, 556 (1920) ("[I]t is not necessary [that an essential element] be so described as to admit . . . *no* doubt [of] what it is . . . ." (emphasis added) (quoting *Fry on Specific Performance* § 209)).

[5] Justice Riggs would require plaintiff to identify an email containing a "formalized promise" to pay. This contradicts the long-standing rule that a memorandum suffices even if it is "informal." *Smith*, 214 N.C. at 604.

be in writing and requiring a written note or memorandum of an oral contract is important."); *Olsen v. Johnston*, 301 P.3d 791, 795 (Mont. 2013) ("The note or memorandum need not contain the entire contract.").

In his brief, defendant cites several cases related to conveyances of land. *E.g.*, *Smith*, 214 N.C. 602 (contract for conveyance of real property); *Jamerson v. Logan*, 228 N.C. 540 (1948) (same). It has long been noted, however, that courts impose heightened particularity requirements to property descriptions in real estate contracts. 10 *Williston on Contracts* § 29:20 (noting that even before the Uniform Commercial Code was adopted, "generally, the courts required greater particularity in descriptions of real estate than in descriptions of goods"); *see also Durham v. Davison*, 118 S.E. 736, 737–38 (Ga. 1923) (noting that because "the lines of the tract of land sought to be conveyed, or the key to these lines, must appear in the writing," "a description of land sold or contracted to be sold may apparently be very elaborate, and yet not sufficient"). This reflects a characteristic difficulty of real estate law: ascertaining land boundaries with exactitude. *See* Bureau of Land Mgmt., U.S. Dep't of the Interior, BLM/WO/GI-17/007+1813, Specifications for Descriptions of Land intro., at 4 (2017), https://www.blm.gov/sites/default/files/SpecificationsForDescriptionsOfLand.pdf (noting that a "land description . . . must be susceptible to one, and only one, interpretation," because "[t]he ambiguous [land] descriptions of the past are the boundary disputes of the future"); *Dayston, LLC v. Brooke*, 630 S.W.3d 220, 224 (Tex. App. 2020) (holding that, under Texas law, "[w]hen it is possible that

more than one tract of land fits the description, the statute of frauds is not satisfied"). Such concerns do not predominate other areas of contract law. Accordingly, this Court hesitates to extend real estate conveyance caselaw to the guaranty contract at issue in the present case.

To be sure, both in and out of the context of real estate conveyances, a memorandum must supply "all the essential elements of the agreement with reasonable certainty." *Kluttz v. Allison*, 214 N.C. 379, 383 (1938). "[B]ut it is not necessary [that an essential element] be so described as to admit . . . *no* doubt [of] what it is . . . ." *Norton*, 179 N.C. at 556 (emphasis added) (quoting *Fry on Specific Performance* § 209); *accord Murdock v. Anderson*, 57 N.C. (4 Jones Eq.) 77, 78 (1858) ("[W]here a sufficient description is given, parol evidence [can] be resorted to . . . in order to fit the description to the thing . . . .").

Thus, even for contracts conveying real property, this Court has not invariably required a memorandum to include a detailed description of the property. Rather, this Court has deemed sufficient many phrases not describing the land itself, such as "his entire tract . . . of 146 acres[,]" *Norton*, 179 N.C. at 553, 556, "the farm on which I now live[,]" *Bateman v. Hopkins*, 157 N.C. 470, 472–73 (1911), and "her house and lot north of Kinston[,]" *Phillips*, 62 N.C. at 194, 197; *accord Carson v. Ray*, 52 N.C. (7 Jones) 609, 610 (1860).

These cases also demonstrate that the use of possessive adjectives is a particularly efficient way to describe an essential element of the contract. *Contrast*

*Bateman*, 157 N.C. at 472–73 (holding the phrase "the farm on which *I* now live" to be sufficient (emphasis added)), *and Phillips*, 62 N.C. at 194, 197 (holding the phrase "*her* house and lot north of Kinston" to be sufficient (emphasis added)), *with Murdock*, 57 N.C. at 78 (holding the phrase "*one* house and lot in the town of Hillsborough" to be insufficient (emphasis added)), *and Capps v. Holt*, 58 N.C. (5 Jones Eq.) 153, 154–55 (1859) (holding the phrase "*a* tract of land lying on the north side of the Watery Branch, in the county of Johnston, and State of North Carolina, containing 150 acres" to be insufficient (emphasis added)).

With these principles in mind, we turn now to their application to the present case.

In the September email, defendant wrote, "It is important to *us* to always pay *our* valued partners quickly . . . ." (Emphases added.) Being written by defendant, it is readily apparent that the words "us" and "our" refer to himself and Nick. The email goes on to read, ". . . for their services rendered . . . ." Although informal, the average person reading this language would interpret it to mean that defendant was paying for services rendered pursuant to some type of agreement. Next, the email states, "[S]o rest assured your invoice will be turned around immediately and a check sent upon receipt." Here, "so" means "therefore" or "consequently." *So, Merriam-Webster's Collegiate Dictionary* (10th ed. 1999). The use of the language "*your* invoice will be turned around immediately," following the word "so," has a clear apparent meaning: you are one of our trusted partners rendering services to us, and therefore, you will

be paid quickly.[6] (Emphasis added.) This written statement memorializes defendant's obligation to pay.[7] Indeed, defendant would have had no reason to make such assurances unless he *himself* bore responsibility for such payment.

Defendant's subsequent emails further evidence the guaranty agreement. For example, defendant's December email to plaintiff attached the complaint filed against Nick and wrote: "It looks like the saga continues with Nick's legal issues with his business. I am attaching the legal document he just received for your review." Then, in the very next line, defendant asked plaintiff to communicate with *him* specifically: "Please let *me* know how *we* can best work *together* in this regard." (Emphases added.) Likewise, when asking for further clarity on the outstanding balance in his June email, defendant wrote: "*We* may be missing a payment made on, or about 1/10/20." (Emphasis added.) Usage of the term "we" in these emails makes sense only if it includes *defendant* as one of the parties[8] responsible for missed payments.

---

[6] At oral argument, defendant conceded that one "could make that inference" upon a "close textual reading" of the email. *See* Oral Argument at 48:24–40, *Smith Debnam Narron Drake Saintsing & Myers, LLP v. Muntjan* (No. 29A24) (Sept. 24, 2024), https://www.youtube.com/watch?v=QfQsAyuv2Mg.

[7] Even Justice Riggs's dissent recognizes that "[i]t is true some of [defendant]'s language implies shared responsibility, particularly his . . . use[ ] [of] the plural pronouns 'us' and 'our.' "

[8] Justice Riggs insists that the statute of frauds will liberate defendant from performing his oral guaranty contract unless a memorandum shows that he "assumed *sole* responsibility to pay Nick's legal fees." (Emphasis added.) This misapprehends the law. A guaranty agreement is "[a] promise to answer for the payment of some debt . . . in case of the failure of *another who is liable in the first instance.*" *Guaranty*, *Black's Law Dictionary* (12th ed. 2024) (emphasis added). "A guaranty can exist only where there is some principal or substantive liability to which it is collateral." *Id.*

By contrast, if a "writing recommend[s] *another*" as reliable "and assur[es] . . . that *the third person* will comply fully with any contract that may be entered into with him," this

This happened yet again in July, when the following emails were sent:

> Defendant: The finances and the stress from this situation have been profound and a major setback on many levels. Would this $3000 be the cap you mentioned could be achieved[,] Mr. Saintsing?
>
> Saintsing: Yes, we would agree to cap the fees for responding to the discovery at $3,000. . . .
>
> Defendant: Thanks . . . ! It sounds like [d]iscovery would be the last item *we* need to *deal with* now that we have the bankruptcy being considered?

(Emphases added.) "Deal," in this context, is defined as: "To take action with respect to someone or something." *Deal*, *The American Heritage College Dictionary* (3d ed. 1997). In choosing to say "we," defendant positioned *himself* as one who would be responsible for taking action with respect to the $3,000-capped fee for discovery responses.[9] The action one takes on a fee is to pay it.

In combination, defendant's emails constitute a written memorandum of the essential terms of defendant's oral promise to pay for Nick's legal debts to plaintiff, satisfying the statute of frauds. *See Smith*, 214 N.C. at 604. Accordingly, we reverse the judgment of the Court of Appeals.

---

does not imply that the writer will guaranty the contract. *Fain Grocery Co. v. Early & Daniels Co.*, 181 N.C. 459, 461 (1921) (emphases added) (construing *Clerke v. Harwood*, 3 U.S. 415 (1797)).

[9] It is notable that the invoices were paid using defendant's credit card.

## V.    Conclusion

For the reasons stated above, we hold that defendant's emails to plaintiff constitute a memorandum or note of defendant's oral guaranty to pay for Nick's legal debts to plaintiff. Here, on these specific facts, the statute of frauds is satisfied. *See* N.C.G.S. § 22-1. Accordingly, we reverse the judgment of the Court of Appeals.

REVERSED.

Justice DIETZ dissenting.

I agree with the majority that the trial court's judgment is correct and that the Court of Appeals should have affirmed it. As the trial court properly determined, Muntjan entered into an *original* promise with the firm. The law firm's testimony and evidence—which the trial court expressly found credible—together with the parties' course of dealings demonstrate that Muntjan bargained for a level of control over this legal case that an ordinary guarantor would not have. This "distinct consideration" creates a contract directly between Muntjan and the firm. *See Kelly Handle Co. v. Crawford Plumbing & Mill Supply Co.*, 171 N.C. 495, 501 (1916).

Unfortunately, although this was the express reasoning of the trial court, it is not the reasoning of the dissent at the Court of Appeals. And, for whatever reason, the firm chose not to petition for discretionary review of grounds not addressed by the dissent. Thus, our review is limited to the statute of frauds issue "specifically set out in the dissenting opinion as the basis for that dissent." *Mitchell v. Univ. of N.C. Bd. of Govs.*, 388 N.C. 341, 349 (2025).

On that issue, this is a much closer case. I certainly think it is reasonable to interpret Muntjan's string of emails as confirmation that he is a guarantor. But I'm not sure that is the *only* reasonable interpretation, and thus I am not persuaded that these emails satisfy the statute of frauds. *See Kluttz v. Allison*, 214 N.C. 379, 383 (1938).

In any event, I expect this case to have very little impact on our statute of frauds jurisprudence. Given the unusual facts, this Court's holding is quite fact-bound. In my view, the biggest lesson in this case is about appellate practice. The law firm squeaked out a win here, but had it bothered to petition for discretionary review, that narrow victory might instead be a unanimous one.

Justice RIGGS dissenting.

The only issue before us now is whether Paul Muntjan's emails to a law firm satisfy the statute of frauds and establish a written guaranty to cover his son Nick Muntjan's legal fees.[1]  While the firm provided services and its desire to be paid for those services is understandable, when that equitable consideration conflicts with black letter law, our hands as judges are tied.  I do not believe that we can provide the relief requested by the firm.  Because Paul Muntjan's emails do not contain an explicit, definite promise to pay for his son's continued legal services, I would hold the purported agreement unenforceable for failing to meet the statute of frauds, and thus I respectfully dissent.

## I.    Discussion

I do not share the majority's belief that there has been a misapprehension of the law as to whether North Carolina's statute of frauds required Mr. Muntjan's promise to be in writing for the promise to be enforceable.  That is exactly what the statute of frauds required here.  *Burlington Industries, Inc. v. Foil*, 284 N.C. 740, 750–52 (1974) (providing oral guaranties fall within the statute of frauds and are required to be in writing).  Although the writing, however informal, does not need to be a complete contract nor follow a particular form, this Court has said it must

---

[1]As Justice Dietz and the majority both recognize, a different analysis applies to original promises, which do not fall under the statute of frauds.

contain the essential or material terms of the parties' agreement. *Smith v. Joyce*, 214 N.C. 602 (1939). In *Winders v. Hill*, we explained that, though admission of an agreement in certain correspondence and conversation between parties is "sufficient memorandum," 144 N.C. at 617, compliance with the statute of frauds requires that the written admission, when used to evidence an agreement, must contain "internal evidence of the contract or refer to some writing that does." *Id.* at 618.

I read the majority's interpretation of the statute to suggest that all an oral guaranty needs to be enforceable is some signed "memorandum or note"—such as the emails sent by Mr. Muntjan—that bolsters that the guaranty exists. However, the statute requires that the emails show that Mr. Muntjan, who was not the firm's client, actually promised to pay the entirety of his son's legal fees. None of the emails contained such a promise nor referred to it. Thus, I believe the statute of frauds was not satisfied here.

## A. The statute of frauds was developed to limit enforcement of some contracts prone to fraud.

First, the ultimate purpose of the statute of frauds was historically, and still is, to limit judicial enforcement of certain kinds of agreements more susceptible to fraud, and to that end, courts required written evidence of those agreements. 9 *Williston* on Contracts § 21:1 (4th ed. 2025) (explaining the purpose and history of the English statute of frauds and its influence on American courts); *see Allison v. Steele*, 220 N.C. 318 ("But the purpose of the statute is to prevent fraud upon individuals charged with participation in transactions coming within its

-19-

purview . . . ").  Thus, the statute of frauds has served an evidentiary purpose in our courts.  *Steele,* 220 N.C. at 325 (explaining that a plaintiff is not permitted to show [in evidence] by parol a contract which the law requires to be in writing).

Courts have also uniformly said a writing relied on to satisfy the statute of frauds must contain the essential or material terms of the alleged contract, which in turn promotes reasonable certainty regarding the agreement's terms.  10 *Williston* on Contracts § 29:8 (explaining that inclusion of essential terms of the agreement in the memorandum, according to some courts and the Uniform Commercial Code, show that a contract has actually been made).

**B. North Carolina's statute of frauds requires guaranty contracts to contain the guarantor's promise to pay a particular debt if the obligor defaults.**

North Carolina codified the statute of frauds in the predecessor to Chapter 22 of the North Carolina General Statutes, thereby requiring certain contracts to be written and signed to be enforceable.  *Durham Consol. Land & Improvement Co. v. Guthrie,* 116 N.C. 381, 384 (1895); N.C.G.S. § 22-1 (2025).  A guaranty is one such contract.  In simple terms, a third party's promise to be personally liable for another's debt is a guaranty.  *See Burlington Indus., Inc.*, 284 N.C. at 748.  Thus, for guaranty contracts to be enforceable, N.C.G.S. § 22-1 requires (1) a writing (2) signed by the guarantor and (3) containing the guarantor's promise to pay a particular debt if the obligor defaults.  *See Balentine v. Gill*, 218 N.C. at 498.

To satisfy the writing requirement, a guaranty must be spelled out in "the agreement upon which [the] action [is] brought" or captured in "some memorandum

or note thereof." N.C.G.S. § 22-1. A "memorandum" can be contained in a single document or in "several papers properly connected together." *Smith*, 214 N.C. at 604. While such a memorandum by nature may be informal, *Phillips v. Hooker*, 62 N.C. 193, 196 (1867), the memorandum at issue "must state the contract with reasonable certainty so that its essential terms can be ascertained from the writing itself without resort to parol evidence." *Smith*, 214 N.C. at 605 (cleaned up). Put differently, the statute of frauds still requires that an enforceable contract contain expressly or by necessary implication "the essential elements of a valid contract." *Id.* at 604. Thus, to constitute an enforceable contract covered under the statute of frauds, the written memorandum or note must be sufficiently definite to show the essential elements of a valid contract.; *Carr v. Good Shepherd Home, Inc.*, 269 N.C. 241, 243 (1967) (quoting *Smith*, 214 N.C. at 604).

If a party offers separate documents as written evidence of an agreement, those papers must be so linked "physically or by internal reference that there can be *no uncertainty* as to their meaning and effect when taken together." *Smith*, 214 N.C. at 604 (emphasis added) (cleaned up); *see also Simpson v. Beaufort Cnty Lumber Co.*, 193 N.C. 454, 455 (1927) ("Two or more writings properly connected may be considered together, matters missing or uncertain in one may be supplied or rendered certain by the other, and their sufficiency will depend upon whether, taken together, they meet the requirements of the statute as to contents and signature." (cleaned up)). But, that "connection cannot be shown by extrinsic evidence." *Simpson,* 193

N.C. at 455; *see also Mayer & Morgan v. Adrian & Vollers*, 77 N.C. 83, 88 (1877) (explaining that an enforceable "agreement must adequately express the intent and obligation of  the parties," and so "[p]arol evidence cannot be received to supply anything which is wanting in the writing to make it the agreement on which the parties rely").  Thus, for such correspondence (like emails) to constitute an agreement enforceable under the statute of frauds, the correspondence must "sufficiently refer[s] to some writing in which the terms are set out and which itself contains all the requisites of a valid contract or memorandum under the statute." *Winders*, 144 N.C. at 618–19*; Balentine*, 218 N.C. at 498.

## C. Mr. Muntjan's emails do not contain a promise to pay Nick's debt.

Mr. Muntjan's emails, when read together, refer to the impending litigation, the firm's services, and the general topic of payment.  But they neither contain an express promise undertaking sole responsibility to be indefinitely liable for Nick's legal fees nor do they refer to any written instrument of such an agreement.  It is true some of Mr. Muntjan's language implies shared responsibility, particularly his email from September 2019 which uses the plural pronouns "us" and "our," and asks the firm to send future invoices to Mr. Muntjan's email, suggesting his ongoing involvement.  But it does not change the key fact that the firm cannot point to any statement in which Mr. Muntjan assumed sole responsibility to pay Nick's legal fees. Nor can the firm point to any statement in which Mr. Muntjan references a formalized promise to do so.

That is a crucial omission. In case after case, this Court has declined to enforce a contract if a writing did not capture a guarantor's express promise to pay. For example, an attorney did not guaranty a client's debt based on a letter reading: "Subject to Mr. Simpson's approval, which I feel certain he will give, this firm will make restitution to you out of the net proceeds from any settlement or court recovery we make with regard to Mr. Simpson's personal injury claim[.]" *Forbes Homes, Inc. v. Trimpi*, 318 N.C. 473, 474 (1986). A company did not guaranty the defendant's debt when it sent a telegram stating: "[Defendant company] reliable people. Any justifiable claims will be taken care of promptly." *Fain Grocery Co. v. Early & Daniels Co.*, 181 N.C. 459, 459 (1921). A defendant's note to reimburse the plaintiff for $600 did not show an enforceable "contract for the conveyance of the land to the [plaintiff]" because the writing "contained only a promise on the [defendant's] part to pay the money, but no reciprocal promise of the defendant to convey the land." *Burriss v. Starr*, 165 N.C. 657, 659, 661 (1914). Moreover, this Court has voided agreements when they failed to contain an express promise. *Id.* at 661–62. ("There is no such contract here. The note of the defendant, although written by the plaintiff, contained only a promise on his part to pay the money, but no reciprocal promise of the defendant to convey the land . . . ").

By contrast, we held there was a binding guaranty contract where a letter contained a written assumption of personal responsibility. In *Standard Supply Co. v. Person & Finch*, the defendant made a "definite promise" in a letter, amongst a

series of letters, that said: "[J]ust as soon as the dry kiln gets in operation, I will see that your bill is paid." 154 N.C. 456, 461 (1911). In *Simpson v. Beaufort County Lumber Co.*, we held that the plaintiff had shown a "sufficient memorandum in writing, signed by the party to be charged therewith" as required under the statute of frauds based on the letters and telegrams that showed a "plain and explicit" contract to buy a tract of land. 193 N.C. at 456.

Perhaps unsurprisingly, this case is not our first time dealing with a father's promise to cover his son's debts. In *Hickory Novelty Co. v. Andrews*, we held that a series of letters established a father's promise to cover his sons' debts. 188 N.C. 59 (1924). But that case featured what this case lacks: A father's express written agreement to pay his children's obligations. *Id.* The sons owned and operated a lumber firm that owed a debt to the plaintiff, and the father, hoping to keep his sons' business afloat, wrote a letter reading as follows: "This will advise that I am interested in [the lumber firm], and will personally see that all business transactions between [the lumber firm] and [plaintiff] are settled and adjusted satisfactorily entirely with your concerns." *Id.* at 60. To vouch for his solvency, the father attached a letter from a bank showing that he was "personally responsible for all outstanding accounts up to this date, and all accounts which will follow." *Id.* The father implored the plaintiff that "if there is anything pertaining to this business which is questionable, please advise me personally at once, and I will straighten out the matter entirely to your satisfaction." *Id.*

When the firm incurred more debt, one of the plaintiff's managers wrote the father "reminding him of his obligation" for his sons' business debts. *Id.* at 61. After "discuss[ing] the matter with [the lumber firm]," the father explained, his sons agreed to send $500 checks every fifteen days until the debt was paid. *Id.* at 62. But if "they do not carry out the above plans," the father advised the plaintiff, "kindly notify me and I will see that they are carried out to your satisfaction." *Id.* In reply, the manager confirmed that the father "will be responsible for this agreement being carried out to my satisfaction, which is in accordance with your former guarantee to us." *Id.*

By the time the case reached this Court, though, the issue was simple: did the father make an enforceable guaranty to pay his sons' debt? *Id.* at 64. We said yes. *Id.* First, the "guaranty was in writing, as required by the statute [of frauds]." *Id.* at 66. More, the father expressly promised to pay "the future debts or obligations" incurred by the lumber firm. *Id.* at 67. And it was not a one-time agreement but a continuing guaranty. *Id.* Simply put, the *Novelty* father's promise was not susceptible to multiple interpretations. *Id.* And later writings confirmed "that [he] understood the liability he had created and incurred." *Id.*

In the present case, the firm cites *Novelty* as support and centers the reference in *Novelty* to *Newcomb v. Kloeblen*, 77 N.J.L. 791 (1909), an "on point" New Jersey decision. In *Novelty*, this Court cited *Newcomb* with approval in finding a continuing guaranty when a father wrote to a company: "I will be responsible for any bill that my son James will make." *Novelty*, 188 N.C. at 66. Based on that language, the firm

contends that a promise to pay can be a simple statement rather than a robust declaration, but it misses the more important point: the fathers in both *Novelty* and *Newcomb* explicitly promised to make good on their sons' debts. No such language exists here. Mr. Muntjan never assumed responsibility for Nick's legal expenses in the same way. And his emails were not connected—either physically or by "internal reference"—to "other writings so as to constitute a valid and sufficient memorandum" containing "the essential elements of a contract." *Smith*, 214 N.C. at 604–05. That omission overrides any facial similarities between this case and *Novelty*. Mr. Muntjan—like the father in *Novelty*—certainly seems to have involved himself in his son's business affairs. As the firm notes, Mr. Muntjan used plural pronouns like "us" and "ours," gestured at future business with the firm, and asked that "any and all invoices [be] sent to my email." But those parallels cannot patch the key difference. The father in *Novelty* put his guaranty into writing across multiple letters. Mr. Muntjan did not— a fact that holds true whether the focus is on a single email or a number of his messages stitched together.

The reason why the statute of frauds requires us to deem as unenforceable any contract established here, as unpalatable as it may be from an equity perspective, can be demonstrated through a counterfactual based on the actual emails in this case: Suppose Mr. Muntjan had orally promised the firm that he would help manage the legal case for Nick by occasionally paying his legal fees and handling administrative tasks, such as communications with the firm, but he verbally emphasized he did not

agree to be a guarantor or to be contractually bound to pay if his son did not. The emails relied on by the majority in this case to support the argument that Mr. Muntjan's emails constitute a memorandum or note of Mr. Muntjan's oral guaranty would now support with equal weight the counterfactual scenario in which Mr. Muntjan promised to occasionally assist Nick. For example, consider the following emails sent between the firm and Mr. Muntjan:

- On 23 September 2019, Mr. Muntjan wrote:

  "Hi Byron, Received your email as address to son Nick regarding the case and request for prompt payment. It is important to us to always pay our value partners quickly for their service rendered so rest assured your invoice will be turned around immediately and a check sent upon receipt. Please note as of this date that no invoice has been received. As a reminder, please insure any and all invoices are sent to my email due to my travel schedule."

- On 18 December 2019, Mr. Muntjan wrote:

  "Hi Byron and Happy Holidays! It looks like the saga continues with Nick's legal issues with his business. I am attaching the legal document he just received for your review. Please let me know how we can best work together in this regard."

- On 4 June 2020, Mr. Muntjan wrote:

  "Please be advised that the attached invoice the firm sent dated June 4, 2020 does not reflect payment made on the account dated May 12, 2020. Attached is a record of the payment in question. Please send a corrected invoice at your earliest convenience."

- On 8 June 2020, Mr. Muntjan wrote:

  "Would you be so kind to furnish a list of payments made on this account? We may be missing a payment made on or

about 1/10/20.

- On 16 July 2020, Mr. Muntjan wrote:

  "Thanks Byron! It sounds like Discovery would be the last item we need to deal with now that we have the bankruptcy being considered? Please refresh my memory on what the Discovery pertains to. Could we eliminate Discovery if we close the company?"

Though these emails imply a shared responsibility, reading the emails now with the counterfactual in mind, it can be just as true that these emails support the counterfactual contention offered: Mr. Muntjan is assisting Nick by handling his emails, managing his case, and assuring that his son will timely pay his legal fees, especially given that Nick was on the brink of bankruptcy. The emails could plausibly and reasonably support both the alleged promise in the case at hand and the counterfactual promise, and the statute of frauds was designed to require proof to avoid such uncertainties. *See Winders*, 144 N.C. at 618 (requiring writing to contain internal evidence of the contract to be proved or refer to some writing that does).

The majority places excessive emphasis on inferred meanings and implications rather than a clear assumption of responsibility. But without a written agreement to foot Nick's legal bills "then existing [or] to be incurred in the future," the emails lack an essential element of a guaranty contract. *Cf. Novelty*, 188 N.C. at 67.

## II.  Conclusion

While I understand the firm's reasonable desire to recover for their services

rendered, this Court should not set aside decades of clear precedent on the application of the statute of frauds to guaranty agreements to produce that outcome. In short, the emails here did not contain a clear, definite promise to pay for another's debt. Thus, the firm lacks an enforceable guaranty under the statute of frauds. Accordingly, I respectfully dissent.

Justice EARLS joins in this dissenting opinion.